No. 13662

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

---

MOODY J. HARRINGTON and
VICKY HARRINGTON, husband and wife,

Plaintiffs and Respondents,

-vs-

HOLIDAY RAMBLER CORPORATION,

Defendant and Appellant.

---

Appeal from: District Court of the Eighth Judicial District,
Hon. Nat Allen, Judge presiding.

Counsel of Record:

For Appellant:

Church, Harris, Johnson & Williams, Great Falls,
Montana
Donald LaBar argued and Earl Hanson argued, Great
Falls, Montana

For Respondents:

Hoyt and Bottomly, Great Falls, Montana
John Hoyt argued and Tom Lewis argued, Great Falls,
Montana

---

Submitted: November 28, 1977

Decided: JAN 13 1978

Filed JAN 13 1978

*Thomas J. Kearney*
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court:

Plaintiffs Moody J. Harrington and Vicki Harrington commenced this action in the District Court, Cascade County, alleging fraud and breach of warranty to recover damages from alleged defects in a travel trailer purchased by them from Holiday Rambler Corporation. The jury returned a verdict for both general damages and punitive damages in favor of Harringtons. From this final judgment Holiday Rambler appealed.

Holiday Rambler is a manufacturer of travel trailers and sells these trailers to qualified independent dealers throughout the United States, who in turn sell directly to the public.

The trailer involved in the instant litigation is a 1972 model Holiday Rambler Travel Trailer constructed by defendant in Wakarusa, Indiana, in September 1971. Similar to the automobile business, the travel trailer business manufactures some of the new models prior to the beginning of a calendar year, and the travel trailer in question here was one of the first of the 1972 models produced in the fall of 1971. It was 8 feet wide and 31 feet long with tandem axles.

An independent Spokane, Washington dealer, Don King, transported the trailer to Spokane from the factory after a dealers' meeting in September 1971. Before the trailer left the factory its various components, including the LP gas system, plumbing system, water system, and electrical system were checked and approved. The dealer, Don King, who was never made a party to the action, but testified the same systems were checked for the Harringtons prior to the time they purchased the trailer and took delivery in Spokane, Washington, on March 6, 1972.

The total purchase price of the travel trailer was $9,506.90. They paid $2,506.90 down, and the remaining balance of $7,000 was financed over 7 years at 12 percent interest.

On March 11, 1972, the Harringtons left Spokane for Great Falls, Montana and after they settled in Montana they complained of defects in the trailer to Holiday Rambler. At that time Holiday Rambler offered, in writing, to make repairs to the total satisfaction of the Harringtons without cost only if the Harringtons would bring the trailer to the factory at Wakarusa, Indiana. They refused this offer of repair and insisted on a new trailer.

In August 1972, the trailer was parked adjacent to the home of the Harringtons' attorney and left there until the time of trial in November 1976. It was stored outside, exposed to the elements and was vandalized on one occasion. The warranty had several months to run at the time the trailer was left with the attorney.

After the trailer was parked at the lot of their attorney no repair requests were made by the Harringtons, no efforts were made to either repair or sell the trailer, and it was abandoned and depreciating until the time of trial. Monthly payments to the finance company eventually ceased in late 1973.

Holiday Rambler defended principally upon the grounds the Harringtons intentionally relinquished any claims they might otherwise have had after they rejected the clear, unequivocal offer to repair made by Holiday Rambler to Harringtons. Further, Holiday Rambler claimed that Harringtons failed to mitigate their damages and contended it never was given a reasonable opportunity to repair the travel trailer.

The case was tried before a jury commencing on November 8, 1976 and continued until November 11, 1976. The jury returned a verdict in favor of plaintiffs and against defendant, assessing $17,691.90 in general damages and $20,000 in punitive damages.

The issues presented for review are:

1. Whether the verdict for general damages in favor of plaintiffs was supported by substantial credible evidence?

2. Did the court commit reversible error in overruling defendant's objection to plaintiffs' testimony concerning opinions as to causation of physical illness?

3. Did the court commit reversible error in giving plaintiffs' proposed instruction on punitive damages?

4. Did the court commit reversible error in giving plaintiffs' proposed instruction on "implied malice"?

5. Did the court commit reversible error in denying defendant's motions for directed verdicts on the issues of:

    a. actual fraud;

    b. constructive fraud; and

    c. strict liability.

Issue 1. In Strong v. Williams, (1969), 154 Mont. 65, 68, 460 P.2d 90, this Court said:

> "It is well settled in this jurisdiction that wherever there is a conflict in the evidence this Court may only review the testimony for the purpose of determining whether there is any substantial evidence in the record to support the verdict * * *. Where the evidence is conflicting, but substantial evidence appears in the record to support the judgment, the judgment will not be disturbed on appeal * * *."

See also: Kirby v. Kelly, (1972), 161 Mont. 66, 504 P.2d 683; Davis v. Davis, (1972), 159 Mont. 355, 497 P.2d 315.

It is apparent from the record that the jury as a matter of law misconstrued the court's instruction on the measure of

- 4 -

damages for breach of warranty i.e., the difference between the value of the goods accepted and the value they would have had if they had been as warranted. The jury awarded the sum of $12,691.90 for the trailer as a part of the general damages. The total price paid by plaintiffs for the trailer was $9,506.90. That price included options and services which were sold to them directly by Don King Trailer Sales and were not warranted products on the trailer when the trailer was sold by Holiday Rambler to Don King. These added options and services had a total value of $1,506.90. The jury awarded the value of the entire retail value of the trailer, the value of all the services and options supplied by Don King, and in addition awarded the total amount of time charges for the entire amount of the sales contract, all of which amounted to $12,691.90. Although there are but a few cases on this point, it is the rule of law that a consumer purchaser cannot recover the purchase price from the manufacturer who was not a party to the sale on the grounds of breach of warranties. Carlson v. Shephard Pontiac, Inc., (1970), 63 Misc.2d 994, 314 N.Y.S.2d 77. The reason for this rule is apparent in the instant case. The defendant, Holiday Rambler, did not receive the sales price. The actual sales price which included the dealer's profit was received and retained by Don King, the independent dealer, who was not a party to this action. The only money received by Holiday Rambler was the wholesale price which was paid by Don King to Holiday Rambler. Therefore, Harringtons would have to join the dealer as a party and sue for recission to recover the full purchase price, which included the dealer's profits. This, plaintiffs failed to do. The jury awarded damages for the full purchase price which

included the brake controls, awning, trailer hitch, all items not manufactured or supplied by Holiday Rambler. Also, Holiday Rambler had no part in the financing, which was handled through the dealer.

Holiday Rambler contends that it is a universal rule that a party must mitigate all of his damages. Holiday feels that Harringtons' failed to mitigate damages by not having the trailer repaired by a third party, failing to cover by purchasing a substitute trailer and continuing to use the trailer after they knew of defects. This doctrine of avoidable consequence is properly stated in Spackman v. Ralph M. Parsons Co., (1966), 147 Mont. 500, 505, 414 P.2d 918, 921, where this Court held:

> "The duty to reduce or mitigate damages is a positive one upon the injured person, but it has limits. The test is: What would an ordinary prudent person be expected to do if capable, under the circumstances?"

The record discloses the Harringtons did everything within their power to have the trailer repaired by the authorized Holiday Rambler dealer. They did not take it to a third party to be repaired because they were fearful of voiding the warranty. A suggestion that Harringtons should have to buy another trailer for some $9,000 is clearly not within the doctrine. Harringtons had no other choice but to use the trailer after they discovered the defect. It was serving as the family home because of a severe housing shortage in Great Falls when the family arrived there.

As stated, the jury in awarding damages failed to:

(1) Subtract out accessories and services totaling $1,506.90 for which Holiday Rambler did not warrant and is not liable.

(2) Take into account that Holiday Rambler is not liable for finance charges which totaled $3,185.

There is substantial credible evidence to support a proper verdict computed as:

| | |
|---|---|
| General Damages Given by District Court | $17,691.90 |
| Less Services & Accessories | -1,506.90 |
| Less Finance Charge | -3,185.00 |
| Proper award | $13,000.00. |

Issue 2. Holiday Rambler contends the trial court erred in overruling its objection to unqualified opinion evidence given by Mr. Harrington regarding causation of physical illness. Harringtons presented no medical testimony of a physician. They presented no copies of medical records or bills of any doctor or hospital. The only proof of any physical sickness caused the Harringtons due to defects in the trailer was given by the Harringtons themselves. The testimony given by Moody Harrington should not have been admitted over objection of counsel. The testimony speculated as to the cause of sickness incurred by Harringtons while living in the trailer. Moody Harrington was not qualified to make such conclusions and all his testimony was self-serving. However, this error by the trial judge was harmless in view of testimony of physical injury and illness to the Harringtons by way of Vicki Harrington which was admitted into evidence without objection of defense counsel. This testimony was, in part:

"Q. Now were there any other defects in the trailer that you noticed? A. Yes, there were.

"Q. Tell the jury about those? A. The front window in the trailer leaked, and there were some sharp edges on the table, and my daughter cut her finger twice on that.

" * * *

- 7 -

"Q. Now, was there a gas leak in the trailer at any time? A. Yes, there was, a serious gas leak.

"Q. All right, how serious? A. Well, for three weeks we kept getting sick, well, I should say, the children and I, you know, because my husband was gone quite a bit of the time, and so we were getting sick more than he did. The way it started out, I started getting headaches galore, and was nauseous all the time, in fact, I thought that there was maybe something else that was wrong, which there wasn't, but we just kept getting sicker and sicker, and the headaches wouldn't go away, and if we went away for a visit, or went shopping for the day, the headaches would disapper, and we would come home at night, and we would be in the trailer for thirty minutes, and the headaches would start again, and so I had started taking the children that time to the Air Force doctor, you know, out at the base, and he thought that we had a mild case of the flu, so he said for us to eat just plain toast, and plain soda crackers, and tea, but not to take solid food for awhile, so that's the food that we stayed on for approximately ten days, because it just kept getting worse, and finally I kept thinking, 'Well,' I says, 'the odors were smelling so bad, that I've got to do something,' so I got hold of Modern Equipment Company, and I told them that I suspected that there might be a gas leak, but I don't know for sure, but something is certainly making everybody sick, and it just hasn't gone away, and I didn't think by that time that it was the flu, because there was no diarrhea or any of the other symptoms which, you know, a person might have with the flu, so Modern Equipment came out, and, sure enough, there was a gas leak, and underneath the burner, you know, would be the, well, the second burner in this way that you turn on, the man discovered in the copper tubing that comes out, you know, to put the gas in, you know, that come up to where you turn the button on, there was a defective hole underneath there, and that's where the gas was escaping from, so he went ahead and cut this piece out, and fixed it.

"Q. And then did you all get well? A. Yes sir, we did.

" * * *

"Q. What was the next thing, then, that you discovered was wrong with the trailer? A. Well, in the kitchen area, the paneling overhead fell down in the kitchen area also, as well as the paneling in the living room.

"Q. Also the paneling in the kitchen? A. Yes.

"Q. All right, and then after that, Mrs. Harrington, what happened? A. Well, after that I started noticing that there were odors in the trailer, and when I say 'like odors' it was like that maybe there was, oh, like for instance you left a window open, and there was an outhouse close by.

"Q. Did these odors bother you? A. Yes, they did.

"Q. How bad did these odors get? A. Well, they got to the point that if you were trying to eat your dinner, the odors in the trailer itself,you know, it was certainly quite evident that the odors were there, and we had a terrible problem trying to eat, and I used a great amount of Lysol and other stuff, you know, trying to get rid of that odor, but it would not go away.

"Q. Did your children complain at all about these odors in the trailer? A. Well, not to the point that they complained about the odors in the trailer so much, but they knew that the odors, well, my daughter mentioned to me that her bedroom smelled funny.

"Q. And did these odors affect the food that you had in the trailer? A. Yes, they did.

"Q. In what manner? A. Well, for instance, I had graham crackers in there, and I had Ritz crackers, and I had cookies, oh, let me see, those were Oreo cookies, and I had those up in the cabinet, and I had Rice Krispies stored up there in the cabinet too, and when I would go to feed my daughter this food, oh, like giving her a bowl of Rice Krispies before she would go to school and she kept on saying, 'Ahhh, don't make me eat that stuff,' she said, because she said it was making her sick, and I said, 'Well, you've got to eat,' I says, 'Because you've got to go to school,' and she kept on refusing to eat her food. Well, I would make her eat it, you know, because she had to have her food, and she would throw up.

"Q. And who is 'she?' A. My daughter, Sharon.

"Q. And how old was she then? A. That time about five and a half.

"Q. And Sharon would become ill? A. Yes sir.

" * * *

"Q. Now, how much concern did you have, Mrs. Harrington, for yourself, and your children, when they got so sick and so ill, and when you had all of these problems that you have told this jury about? A. Well, it made me very upset, well, not only upset, but as well as ill, due to the fact that I having to have to take the children to the doctor when I was sick.

"Q. This would cause you additional problems, is that right? A. Yes sir."

- 9 -

There is ample evidence in the record that the Harrington family suffered emotional distress at the hands of Holiday Rambler. This Court in McGuire v. American Honda Co., (1977), ____Mont.____, 566 P.2d 1124, 34 St.Rep. 632, relied on lay testimony of the plaintiff, his wife, and the plaintiff's cousin in determining that there was substantial credible evidence in support of the plaintiff's theory of causation. The testimony of Vicki Harrington, all of which went into evidence without objection, is admissible to show that a manufacturing defect caused these injuries.

Issue 3. Holiday Rambler contends the Court erred in giving plaintiffs' instruction on punitive damages. It characterizes this case as one arising under contract in an attempt to bring the case within the limitations of section 17-208, R.C.M. 1947, which provides:

> "Exemplary damages--in what cases allowed. In any action for a breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages may give damages for the sake of example, and by way of punishing the defendant." (Emphasis added.)

It is clear that in Montana, and generally, a party may not pursue both an action for recission and damages for deceit or misrepresentation. Fraser v. Clark, (1960), 137 Mont. 362, 376, 352 P.2d 681. On the other hand, an action on the contract and an action for fraud or misrepresentation in the inducement of the contract are not incompatible. See: Miller v. Fox, (1977), _____ Mont.____, ____P.2d _____, 34 St.Rep. 1367; Paulson v. Kustom Enterprises, Inc., (1971), 157 Mont. 188, 483 P.2d 708; Falls Sand & Gravel Co. v. Western Concrete, Inc., (1967), 270 F.Supp. 495, 500.

- 10 -

Here, it was stipulated by the parties that the pretrial order should supersede the earlier pleadings. In the pretrial order Harringtons alleged Holiday should be made to pay punitive damages because of fraud, malice and oppression by its unjustifiable, deceptive and deceitful conduct in misrepresenting the type and quality of its trailer to people such as plaintiffs and to the consumer public at large. It is clear from the record and the pretrial order that Harringtons were bringing this case in tort, separate and distinct from any action arising out of contract. This case would fall within the parameter of Miller v. Fox, supra; Paulson v. Kustom Enterprises, Inc., supra; and Falls Sand & Gravel Co. v. Western Concrete, Inc., supra. Therefore punitive damages were properly considered.

Issue 4. The court did not err in giving an instruction on implied malice. Section 17-208 authorizes exemplary damages where the defendant "* * * has been guilty of oppression, fraud, or malice, actual or presumed * * *." The instruction in question advises the jury that it is not necessary to show actual malice to recover punitive damages. This instruction is a correct statement of the law.

Issue 5. Holiday Rambler, after instructions were settled, made a motion for a directed verdict on the grounds there was no evidence to support an award for fraud, actual or constructive, and no evidence to support damages for strict liability in tort under §402A, 2 Restatement of Torts 2d.

In reviewing the record there was evidence of both actual and constructive fraud and the court properly allowed these issues to go to the jury. Evidence for recovery under §402A, 2 Restatement of Torts 2d, presented for jury consideration included numerous defects and the effect on the family, including:

1.  A floor which sagged.

2.  A defective hot water tank.

3.  A defective septic tank.

4.  A defective bath tub drain.

5.  A defective gas connection to stove.

This Court in MacDonald v. Protestant Episcopal Church,

(1967), 150 Mont. 332, 336, 435 P.2d 369, stated:

> "* * * In ruling on the motions for dismissal and
> a directed verdict, the court must view the evi-
> dence in the light most favorable to the plaintiff
> and if a prima facie case is made out the motion
> should not be granted * * *."

Here, when applying the rule stated above, the evidence presented

was entitled to jury consideration and therefore the directed

verdict was properly denied.

The judgment of the District Court is affirmed except

for the dollar amount of the damage award. We strike the sum of

$4,691.90 from the general damage judgment and as modified

is affirmed in the amount of $13,000.00.

_____
                    Justice

We Concur:

_____

_____

_____
Justices.

_____
Hon. Peter G. Meloy, District
Judge, sitting for Mr. Chief
Justice Paul G. Hatfield.