FILED

August 13 2008

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 06-0039

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 283

CORPORATE AIR, AIR SERVICES LIMITED
PARTNERSHIP, SKYWALKER INTERNATIONAL, INC.,
MICHAEL W. OVERSTREET, LINDA OVERSTREET,
and LUKE OVERSTREET,

        Plaintiffs, Counter-Defendants and Appellees,

    v.

EDWARDS JET CENTER, MONTANA, INC.,
d/b/a EDWARDS JET CENTER, a Montana corporation,
and A. CLIFFORD EDWARDS, an individual,

        Defendants, Counter-Plaintiffs and Appellants

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                     In and For the County of Yellowstone, Cause No. DV 03-228
                     Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                James H. Goetz, J. Devlan Geddes, Goetz, Gallik & Baldwin,
                Bozeman, Montana

        For Appellees:

                Gerald B. Murphy, Nancy Bennett, Moulton, Bellingham, Longo
                & Mather, Billings, Montana

                              Submitted on Briefs:  December 13, 2006

                                   Decided:  August 12, 2008

Filed:

                _____
                             Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 This case arises out of a dispute over the sale/purchase of two Beechcraft King Air 200 aircraft. The sellers—Corporate Air, Air Services Limited Partnership, Skywalker International, Inc., Michael W. Overstreet, Linda Overstreet, and Luke Overstreet (collectively, "Corporate Air")—filed suit in March 2003 against the buyers—Edwards Jet Center Montana, Inc., doing business as Edwards Jet Center, and A. Clifford Edwards (collectively, "Edwards Jet")—in the District Court for the Thirteenth Judicial District, Yellowstone County. The District Court ultimately granted partial summary judgment in favor of Corporate Air on the question of whether Edwards Jet breached the parties' agreement and on Edwards Jet's express-warranty counterclaim. Thereafter, in a separate order, the court dismissed Corporate Air's remaining claims and Edwards Jet's remaining counterclaims. Subsequent to that, the court awarded damages, attorney's fees, and costs to Corporate Air.

¶2 Edwards Jet contends on appeal that the District Court erred in granting partial summary judgment in favor of Corporate Air on the breach-of-contract and express-warranty claims and in awarding damages to Corporate Air. Moreover, Edwards Jet contends that it was entitled to summary judgment on these claims. Corporate Air cross-appeals, contending that the District Court erred in granting Edwards Jet summary judgment on Corporate Air's other claims and in calculating the damages and attorney's fees to which Corporate Air claims it is entitled. In addition, Corporate Air contends that the District Court erred in refusing to require A. Clifford Edwards to provide Corporate Air with his financial records pursuant to Corporate Air's discovery request.

¶3 We conclude that there are genuine issues of material fact precluding summary judgment on the parties' respective contract-based claims. We further conclude that the District Court's rationales for dismissing Corporate Air's tort claims and for denying Corporate Air's discovery request for Edward's financial records were erroneous. We thus reverse the District Court's judgment; vacate the District Court's orders relating to these matters and to damages, attorney's fees, and costs; and remand this case for further proceedings consistent with this Opinion.

## BACKGROUND AND ISSUES

### I. Overview of the Procedural History and Statement of the Issues on Appeal

¶4 The tenor of the proceedings below was aptly summed up by the District Court in its September 29, 2004 memorandum and order, where the court observed that an "ever increasing level of vitriol" existed in the parties' briefs and motions. Indeed, Corporate Air had accused Edwards Jet of attempting, by use of "smoke and mirrors," to "confuse[ ]" the court, while Edwards Jet had accused Corporate Air of engaging in "licentious" use of the facts and "play[ing] fast and loose with the truth." In addition, the parties had filed cross-motions for sanctions alleging abuses of the discovery process. Not surprisingly, the District Court felt it necessary to order counsel for both sides to conduct themselves "civilly" in addressing the issues before the court. We note, however, that a certain level of enmity continued to appear in the parties' subsequent filings.

¶5 The parties' extensive and often petty wrangling, both before and after the instant action was commenced, has resulted in a factual and procedural history that, at this point,

3

can fairly be characterized as labyrinthine. There is a complaint, an answer, a first amended answer, an amended complaint, and an answer to the first amended complaint. It seems that every conceivable claim and counterclaim has been alleged: breach of contract, failure of consideration, specific performance, breach of the covenant of good faith and fair dealing, fraud, constructive fraud, negligent misrepresentation, deceit, unjust enrichment, intentional interference with prospective economic advantage, promissory estoppel, violation of § 43(a) of the Lanham Trademark Act (*codified at* 15 U.S.C. § 1125(a)), common-law trademark infringement, and punitive damages. And those are just the pleadings. Beyond those, there are seemingly endless motions and cross-motions—e.g., for summary judgment, for partial summary judgment, for protective orders, for sanctions, to compel discovery, to exclude the testimony of certain individuals, etc.—each accompanied by the usual supporting brief, response brief, and reply brief, and some including voluminous appendices. There also are numerous depositions and affidavits—some related to the instant dispute and some related to the parties' unsuccessful attempt in 2001 to negotiate an agreement to buy/sell the aircraft at issue here. There is the May 2002 agreement ultimately reached by the parties and substantial correspondence between the parties both before and after the agreement was executed, as well as numerous contested issues of fact arising out of the agreement and this correspondence. Of course, there are also various orders entered by the District Court during the course of the proceedings, from which the parties now appeal. Many of these filings are included in multi-volume appendices (consisting altogether of 88 tabbed documents) accompanying the parties' appellate briefs.

¶6    In this Court, the parties have raised a number of appeal issues and cross-appeal issues. However, some of these "issues" are nothing more than factual disagreements which this Court is not in a position to resolve. Moreover, the parties' articulation of the issues and the parties' actual arguments do not properly correspond. For instance, at the outset of its opening brief, Edwards Jet identifies two issues: (1) "Whether Edwards properly rejected the two planes when it discovered an undisclosed serious damage history on one plane and an undisclosed five-year gap in log books on the other plane"; and (2) "Whether the District Court erred in resolving numerous contested factual issues in granting partial summary judgement to Corporate Air on its contract theory." The argument section of the brief, however, contains the following four main issue headings: (1) "The District Court misinterpreted the written contract. The District Court further erred in relying on pre-contract events (such as early inspections) despite the clear language of the written contract's merger and integration clause"; (2) "[Edwards Jet] lawfully rejected the planes"; (3) "The spec sheets indicating 'no damage history' are express warranties that cannot be disclaimed"; (4) "In reaching summary judgment in favor of [Corporate Air], the District Court disregarded (and in many cases actually resolved) contested issues of fact which, if the District Court's view of the case is accepted, are clearly material." Corporate Air's response brief contains a similar disconnect between the six issues articulated at the front of the brief and the ten issues set out in the argument section. We have previously disapproved this sort of briefing, as it places this Court in the inappropriate position of having to divine precisely what issues the parties are presenting to this Court. *See Mary J. Baker Revoc. Trust v. Cenex*

*Harvest*, 2007 MT 159, ¶ 3, 338 Mont. 41, ¶ 3, 164 P.3d 851, ¶ 3 (observing that the Rules of Appellate Procedure "place the responsibility of matching arguments with issue statements on the [parties], not this Court"); *see also* M. R. App. P. 12(1)b. (requiring the appellant's brief to contain "[a] statement of the issues presented for review"); M. R. App. P. 12(1)f. (requiring the argument section of the brief to contain the contentions of the appellant "with respect to the issues presented"); M. R. App P. 12(2) (requiring the same of the appellee's brief). We again remind all counsel filing briefs in this Court that they are required to coordinate their issue statements with the arguments actually made.

¶7 The parties' failure to present this Court with a concise articulation of the issues on appeal and the facts that are relevant to those issues has significantly hampered our ability to resolve this appeal. The Court has painstakingly examined the sizeable record and the parties' various contentions and has sifted through the accusations, the counter-accusations, and the factual matters touched on by the parties—some relevant and some totally irrelevant. Having done so, we have determined that only the sale of the two aircraft, and not the sale of the other assets covered by the parties' agreement, is at issue here. Furthermore, aside from its breach-of-contract and express-warranty counterclaims, Edwards Jet has not presented an argument on appeal that the District Court erred in dismissing its other counterclaims. Accordingly, we conclude that the following issues have been properly presented:

1. Did the District Court err in granting partial summary judgment to Corporate Air on the parties' respective breach-of-contract claims and on Edwards Jet's express-warranty counterclaim?

2. Did the District Court err in denying summary judgment to Edwards Jet on its breach-of-contract and express-warranty counterclaims?

3. Did the District Court err in granting Edwards Jet summary judgment on Corporate Air's tort claims?

4. Did the District Court err in denying Corporate Air's discovery request for A. Clifford Edwards' financial records?

5. Did the District Court err in its calculations of damages and attorney's fees?

¶8 Issues 1 and 2 are raised by Edwards Jet, and Issues 3, 4, and 5 are cross-appeal issues raised by Corporate Air. Given our resolution of Issues 1 and 2, we do not address Issue 5. Furthermore, because we are evaluating these issues at the summary judgment stage, we caution that many of the facts discussed below are disputed, have not been proven at trial, and therefore have yet to be resolved by a fact-finder.

## II.  2001 Negotiations

¶9 Corporate Air is an aviation business located in Billings, Montana. Corporate Air's assets included two Beechcraft King Air 200 aircraft and an aviation fixed-based operator (FBO) located at the Billings Logan International Airport. The FBO provided general aviation services, including fuel sales, charter operations, and other ground services. Edwards Jet Center is also an aviation business located in Billings and based at

the Billings Logan International Airport. Edwards Jet Center provides charter service, aircraft maintenance, aircraft sales, and other aviation services.

¶10 In 2001, Edwards Jet and Corporate Air began negotiating for the sale of Corporate Air's FBO and the two Beechcraft King Air 200 aircraft to Edwards Jet. As part of the negotiations, Corporate Air provided "specification sheets" to Edwards Jet for each of the two aircraft. The specification sheets stated that there was "No Known Damage History" for the aircraft, but they also stated that the specifications were "subject to verification upon inspection." Representatives from Edwards Jet flew and conducted some inspections of both aircraft in November and December 2001. The extent of these inspections is disputed by the parties.

¶11 The negotiations for the sale of the FBO and the aircraft eventually fell through. Corporate Air alleges that this was due to Edwards Jet's inability to secure financing, while Edwards Jet contends that the failure of financing was due to the fact that Corporate Air's FBO buildings were appraised at a much lower value than anticipated.

**III. 2002 Negotiations**

¶12 The parties reentered negotiations for the purchase/sale of the FBO and the two aircraft in 2002. According to Corporate Air, representatives from Edwards Jet again flew and inspected the two aircraft during these negotiations. Furthermore, Corporate Air contends that Edwards Jet's Director of Operations stated: "[O]ur maintenance department has done an extensive pre-purchase inspection on the aircraft and has noted all discrepencies." Edwards Jet admits that its employees had flown and examined the aircraft. Edwards Jet also admits that one of its employees made the above-quoted

8

statement. However, Edwards Jet denies the truth of the statement, claiming that no one from Edwards Jet had done an extensive pre-purchase inspection.

¶13 On May 23, 2002, the parties executed an Agreement to Sell and Purchase ("Agreement"), which is at the center of the instant dispute. The Agreement identifies A. Clifford Edwards as the purchaser of the two aircraft and Edwards Jet Center as the purchaser of all other assets (including the FBO); however, the Agreement specifies that Edwards and Edwards Jet Center will be referred to collectively as "Buyer." Edwards Jet agreed to pay Corporate Air $4,200,000 in cash at closing and to grant Corporate Air and the Overstreets 375 hours of King Air 200 flight time. The purchase price was allocated as follows: $950,000 for a King Air 200 aircraft, serial number BB 198 (hereinafter, "BB-198"); $1,050,000 for a King Air 200 aircraft, serial number BB 279 (hereinafter, "BB-279"); $250,000 for all furniture, fixtures, and equipment; $765,000 for assignment of the leasehold interests for all buildings and real property utilized by Corporate Air; $535,000, plus the fair market value of the 375 hours of King Air 200 usage, for goodwill; and the remaining $650,000 for five covenants not to compete. The Agreement further provided that the transaction would close no later than fourteen days from the date of the Agreement's execution (i.e., by June 6, 2002).

¶14 Edwards Jet claims that in early June 2002, one of its mechanics inspected the logbooks for BB-198 and discovered that the plane had a history of wing damage. Edwards Jet notes that the specification sheet for this aircraft provided during the 2001 negotiations contained the representation that the aircraft had "no known damage

9

history." Based on the wing damage, Edwards Jet elected to reject BB-198. Edwards Jet indicated this rejection in a letter to Corporate Air dated June 19, 2002.

¶15 As to the inspection of the logbooks for BB-279, a portion of the text had been written in French and Hebrew. After having the books translated, Edwards Jet states that it found a gap of approximately five years in the logbooks for the airframe. Edwards Jet contends that when it discovered this omission, it decided to reject BB-279 as well. On June 19, 2002, Edwards Jet sent written notice to Corporate Air noting the missing logbook. Edwards Jet stated its belief that this was a material default of the Agreement and acknowledged Corporate Air's right to cure the default, pursuant to the Agreement. Edwards Jet formally rejected BB-279 in a July 3, 2002 letter to Corporate Air and also reiterated the rejection of BB-198. In reference to the two aircraft, the letter stated: "The damage history and missing log books section, respectively, breached the representations."

## IV. The Instant Lawsuit and Summary Judgment, Round I

¶16 Corporate Air filed suit on March 3, 2003, alleging that Edwards Jet had refused to take delivery of the two aircraft and had failed to pay the $4.2 million required by the terms of the Agreement. Corporate Air's first amended complaint enumerates twelve counts: breach of contract, failure of consideration, specific performance, breach of the covenant of good faith and fair dealing, fraud, constructive fraud, negligent misrepresentation, deceit, unjust enrichment, intentional interference with prospective economic advantage, promissory estoppel, and punitive damages. Edwards Jet's answer to Corporate Air's first amended complaint includes eight counterclaims: breach of

10

contract, breach of the implied covenant of good faith and fair dealing, constructive fraud, negligent misrepresentation, fraud/deceit, violation of the Lanham Trademark Act, common-law trademark infringement, and punitive damages.

¶17 The parties filed cross-motions for summary judgment and briefs for and against these motions. For its part, Corporate Air asserted that the parties had a binding contract to purchase the two aircraft and that Edwards Jet's rejection of the aircraft was "pretextual" since Edwards Jet "had ample opportunity to inspect the planes" and since Edwards Jet flew or inspected the aircraft on five occasions in 2001 and once in 2002. Corporate Air argued that Edwards Jet "accepted" both aircraft upon execution of the Agreement on May 23, 2002, and thus was contractually obligated to pay for them. Furthermore, Corporate Air claimed that the two aircraft conformed to the requirements of the Agreement, which contains language that the planes are being purchased "as is." Corporate Air also argued that it was entitled to summary judgment on all of Edwards Jet's counterclaims.

¶18 Edwards Jet claimed that it was entitled to partial summary judgment on four issues: (1) A. Clifford Edwards properly rejected the two aircraft because they did not conform to the Agreement; (2) Corporate Air's claims were governed by contract law (specifically, the Uniform Commercial Code—Sales, Title 30, chapter 2, MCA ("UCC")) to the exclusion of the tort and equitable claims advanced by Corporate Air; (3) Corporate Air's tort and equitable claims were meritless; and (4) dismissal of Edwards Jet Center as a defendant was required because it had fully performed its sole obligation under the Agreement to purchase the FBO. Edwards Jet asserted that the relevant and

11

material facts were uncontested and that Corporate Air and the Overstreets were attempting a "cram down" of the two aircraft. Edwards Jet argued that Corporate Air knew the aircraft were deficient and made it difficult for Edwards Jet's mechanics to inspect the logbooks and the aircraft. According to Edwards Jet, it was only after they had a chance to inspect the logbooks and the aircraft that they discovered the wing damage to one plane and the five-year gap in the airframe logbooks for the other. As a result of these deficiencies, Edwards Jet asserted that it had lawfully rejected the two aircraft. Edwards Jet also contended that Corporate Air's remedy, if any, was found in contract law and that its tort and equitable theories of relief should be dismissed. Finally, Edwards Jet claimed that the statement "no known damage history" on the specification sheets constituted an express warranty that could not be disclaimed.

¶19 The District Court held a hearing on the motions and, on September 29, 2004, issued a memorandum and order. The court granted partial summary judgment in favor of Corporate Air on the breach-of-contract and express-warranty claims. The court reasoned that Edwards Jet "had reasonable and sufficient opportunity to fully inspect both airplanes" and that Edwards Jet's employees "were able to fly the planes on several occasions, with the log books in the aircraft and easily accessible, prior to closing." The court found that the wing damage and the five-year gap in the airframe logbooks "was known" by Edwards Jet prior to signing the Agreement, though Edwards Jet had presented evidence to the contrary with its motion for summary judgment. The court decided that Edwards Jet had "failed to object when it was aware of or at least should have been aware of the 'nonconformities' "; that Edwards Jet took the planes "as is"

under the Agreement; that the aircraft conformed to the Agreement's requirements; and that Edwards Jet, therefore, had breached the Agreement by not paying Corporate Air for the two aircraft. The court declined at this juncture to rule on any of the parties' other claims.

## V.      Summary Judgment, Round II

¶20     In November 2004, Edwards Jet filed a second motion for summary judgment seeking to dismiss all of Corporate Air's remaining claims. Edwards Jet argued that the tort claims were duplicative of Corporate Air's contract claims and that once Corporate Air received the contract measure of damages, it would be made whole. Corporate Air responded that the UCC did not preempt its remaining causes of action and that it still had valid claims for fraud and breach of the covenant of good faith and fair dealing.

¶21     The District Court held a hearing and, on May 9, 2005, entered an order in which the court addressed not only Edwards Jet's second motion for summary judgment, but also Edwards Jet's motion for sanctions under M. R. Civ. P. 26(g), motion to exclude testimony, motion to compel discovery, and motions in limine. In addition, the court addressed the remaining issues from Corporate Air's motion for summary judgment that were not addressed in the September 29, 2004 order, as well as Corporate Air's motion for criminal sanctions, motion to exclude testimony, motion to compel discovery, and motions in limine. The court dismissed Corporate Air's remaining claims, concluding that Corporate Air had relied on a contract theory and thus had elected to be made whole under the Agreement. The court also dismissed Edwards Jet's counterclaims on the ground that they were not supported by the law or the facts. The court declared that "all

13

outstanding matters between the parties in this cause of action are hereby resolved pursuant to this Memorandum and Order," and the court dismissed all remaining motions and causes of action. The court then ordered that a hearing be held to determine damages, costs, and fees.

## VI. Final Judgment

¶22 Because we hold that the District Court erred in granting summary judgment on the contract and tort claims, and because we correspondingly vacate the court's orders with respect to damages, attorney's fees, and costs, we need not set out in detail the calculations for damages, attorney's fees, and costs. We simply note that the court entered judgment awarding the following to Corporate Air: $440,471.07 for BB-279; $390,356.28 for BB-198; $106,707.62 for attorney's fees; and $4,398.50 for costs. Thereafter, Edwards Jet filed a notice of appeal and Corporate Air filed a notice of cross-appeal.

¶23 Additional facts are set forth below where relevant.

## STANDARD OF REVIEW

¶24 We review a district court's grant or denial of a motion for summary judgment de novo, using the same criteria applied by the district court under M. R. Civ. P. 56. *Schuff v. Jackson*, 2008 MT 81, ¶ 14, 342 Mont. 156, ¶ 14, 179 P.3d 1169, ¶ 14. Rule 56(c) provides that the judgment sought "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "A material fact is a fact that

14

involves the elements of the cause of action or defenses at issue to an extent that necessitates resolution of the issue by a trier of fact." *Arnold v. Yellowstone Mountain Club, LLC*, 2004 MT 284, ¶ 15, 323 Mont. 295, ¶ 15, 100 P.3d 137, ¶ 15 (internal quotation marks and brackets omitted). All reasonable inferences which may be drawn from the offered evidence must be drawn in favor of the party opposing summary judgment. *Rosenthal v. County of Madison*, 2007 MT 277, ¶ 22, 339 Mont. 419, ¶ 22, 170 P.3d 493, ¶ 22. Summary judgment is an extreme remedy that should never be a substitute for a trial on the merits if a controversy exists over a material fact. *Mary J. Baker Revoc. Trust v. Cenex Harvest*, 2007 MT 159, ¶ 17, 338 Mont. 41, ¶ 17, 164 P.3d 851, ¶ 17.

¶25 The party moving for summary judgment has the initial burden of establishing both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. *Hughes v. Lynch*, 2007 MT 177, ¶ 8, 338 Mont. 214, ¶ 8, 164 P.3d 913, ¶ 8. If this burden is met, the burden then shifts to the nonmoving party to establish that a genuine issue of material fact does exist. *Hughes*, ¶ 8. If the district court determines that no genuine issue of material fact exists, the court then determines whether the moving party is entitled to judgment as a matter of law. *Hughes*, ¶ 8. This determination is a conclusion of law, which we review for correctness. *Hughes*, ¶ 8.

**DISCUSSION**

¶26 *Issue 1. Did the District Court err in granting partial summary judgment to Corporate Air on the parties' respective breach-of-contract claims and on Edwards Jet's express-warranty counterclaim?*

I. **Conflicting Interpretations of the Agreement**

15

¶27    In its September 29, 2004 order, the District Court determined that Edwards Jet "had ample opportunity to inspect the log books and airplanes before signing the agreement" and that Edwards Jet, upon executing the May 23, 2002 Agreement, "took the planes 'as is' without any further right to inspect." Edwards Jet claims that the court erred in this respect because the Agreement gave Edwards Jet the right to inspect and object to the aircraft *after* signing the Agreement and because the language in the Agreement to the effect that Edwards Jet had inspected the aircraft and was taking them "as is" was operative *as of closing*, not at signing. Corporate Air disagrees with these interpretations of the Agreement and asserts that by signing the Agreement, Edwards Jet represented that it not only had been given the opportunity to inspect the aircraft, but in fact had done so and was taking the aircraft "as is." Thus, as they did in the District Court, the parties dispute what the language of the Agreement actually provides. Accordingly, we begin with an examination of the Agreement to determine whether it gave Edwards Jet the right to inspect the aircraft after the May 23, 2002 signing.

¶28    Before doing so, we note Edwards Jet's contention on appeal that the District Court resolved a number of "hotly contested" factual issues in the context of ruling on the parties' motions for summary judgment. It does indeed appear that the District Court made a number of factual determinations in the face of conflicting evidence presented by the parties. However, we need not list those here or expend a significant amount of time discussing this matter. It suffices to reiterate that "it is inappropriate for a district court to enter 'findings of fact' when addressing a summary judgment motion. Rather, the court simply should set forth the undisputed facts relevant to the legal issues raised, as well as

16

any disputed facts which may preclude entry of summary judgment." *Wurl v. Polson School Dist. No. 23*, 2006 MT 8, ¶ 11, 330 Mont. 282, ¶ 11, 127 P.3d 436, ¶ 11. This is so because, at the summary judgment stage,

> the parties are not arguing over what happened or presenting conflicting evidence; they merely need to know which of them, under the uncontested facts, is entitled to prevail under the applicable law. In such a case, the district court judge need not weigh evidence, choose one disputed fact over another, or assess credibility of the witnesses. He or she must identify the applicable law, apply it to the uncontroverted facts, and determine who wins the case.

*Cole v. Valley Ice Garden, L.L.C.*, 2005 MT 115, ¶ 4, 327 Mont. 99, ¶ 4, 113 P.3d 275, ¶ 4. Accordingly, to the extent the District Court resolved factual issues—"hotly contested" or otherwise—at the summary judgment stage of this case, the court erred, and those factual determinations are hereby vacated.

¶29 With that, we now turn to the basic principles of contract interpretation that guide our analysis.

## II. Basic Principles of Contract Interpretation

¶30 The construction and interpretation of a contract is a question of law. *Perf. Mach. Co., Inc. v. Yellowstone Mount. Club*, 2007 MT 250, ¶ 39, 339 Mont. 259, ¶ 39, 169 P.3d 394, ¶ 39. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Section 28-3-301, MCA. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible . . . ." Section 28-3-303, MCA. "The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Section

17

28-3-202, MCA. "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." Section 28-3-401, MCA. Evidence of the circumstances under which a contract was made and the matter to which it relates may be considered, but such evidence is not admissible to add to, vary, or contradict the terms of the contract. *Baker Revoc. Trust*, ¶ 21.

¶31 Whether an ambiguity exists in a contract is also a question of law. *Baker Revoc. Trust*, ¶ 19. "The existence of an ambiguity must be determined on an objective basis, and an ambiguity exists only if the language is susceptible to at least two reasonable but conflicting meanings." *Perf. Mach. Co.*, ¶ 39. Mere disagreement as to the interpretation of a written instrument does not create an ambiguity. *Creveling v. Ingold*, 2006 MT 57, ¶ 8, 331 Mont. 322, ¶ 8, 132 P.3d 531, ¶ 8; *see also Baker Revoc. Trust*, ¶ 70 (" '[A] conclusion of ambiguity is not compelled by the fact that the parties to a document, or their attorneys, have or suggest opposing interpretations of a contract, or even disagree as to whether the contract is reasonably open to just one interpretation.' " (quoting Richard A. Lord, *Williston on Contracts* vol. 11, § 30:4, at 51-54 (4th ed., West 1999)); *Holmstrom v. Mutual Benefit Health & Accident Ass'n*, 139 Mont. 426, 428, 364 P.2d 1065, 1066 (1961) ("Ambiguity does not exist just because a claimant says so.").

¶32 Where the language of a contract is unambiguous—i.e., reasonably susceptible to only one interpretation—the duty of the court is to apply the language as written. *Ophus v. Fritz*, 2000 MT 251, ¶ 23, 301 Mont. 447, ¶ 23, 11 P.3d 1192, ¶ 23. However, if the contract's language is ambiguous, a factual determination must be made as to the parties' intent in entering into the contract. *Baker Revoc. Trust*, ¶ 19. Where there is an

18

ambiguity, the fact-finder may rely on extrinsic evidence to determine the parties' intent.

*Baker Revoc. Trust*, ¶ 55; *Ophus*, ¶ 29; *Carelli v. Hall*, 279 Mont. 202, 209, 926 P.2d 756, 761 (1996). An ambiguity in a contract is generally construed against the drafter. *Perf. Mach. Co.*, ¶ 39.

## III.    Analysis of the Agreement

### A.    Right to Inspect

¶33    The Agreement discusses at several points the right of the purchaser, A. Clifford Edwards, to inspect the aircraft, though the Agreement is far from a model of clarity on this point. Section 10 of the Agreement, titled "Warranties," states:

> Seller makes the following warranties, AND NO OTHERS, EXPRESS OR IMPLIED, which shall be true and correct as of the date of closing, but shall not have liability if the warranties cease to be true following closing through no fault of the Seller. With the exception of the express warranties stated in this Agreement, Buyer purchases all assets and equipment "AS IS":
>
> (a)    Both King Air Aircraft are and shall be at the time of closing in good operating condition, with all systems operational, in full Part 135 compliance for operation as passenger charter aircraft under Corporate Air's 135 certificate, subject to the qualification concerning engine hours of operation. With respect to the aircraft engines, Seller states that it has furnished all written information in its possession concerning the engines to date. Seller agrees to provide reasonable assistance in the 90-day period following closing to Buyer so that Buyer may elect to either (1) replace the engines, or (2) consider operating practices similar to those of Seller to permit extended time before overhaul. Seller makes no warranty or representation as to the replacement of the engines, nor as to any operating practices which Buyer may elect to adopt so that the engine time may be extended. BUYER PURCHASES THE KING AIRS "AS IS", AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY TO FULLY INSPECT THE AIRCRAFT, AND RELIES ON ITS OWN INVESTIGATION AS TO THE CONDITION OF

19

THE AIRCRAFT AND THEIR COMPONENT PARTS. EXCEPT AS STATED IN THIS AGREEMENT, SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY AS TO THE AIRCRAFTS' AIRWORTHINESS, MERCHANTABILITY, DURABILITY, INCOME-PRODUCING POTENTIAL, FITNESS FOR A PARTICULAR PURPOSE OR USE, AND TO THE EXTENT ALLOWED BY LAW, BUYER DISCLAIMS SUCH WARRANTIES.

¶34     This provision contains conflicting statements as to whether Edwards' right of inspection exists until closing two weeks hence, or whether, by signing the Agreement, Edwards is agreeing that all inspections have already been completed and that the aircraft are being accepted on the date of signing (May 23, 2002) "as is." On one hand, subsection (a) states that Edwards "purchases the King Airs 'as is', and represents that it has had the opportunity to fully inspect the aircraft." This language goes against Edwards' interpretation. Yet, while Corporate Air chooses to isolate Section 10(a), the fact of the matter is that the language is preceded by the following opening statement: "Seller makes the following warranties . . . which shall be true and correct *as of the date of closing*" (emphasis added). This latter language suggests that everything which follows shall be true and correct "as of the date of closing." In other words, Edwards will be purchasing the aircraft "as is" on the date of closing, having had the opportunity to fully inspect the aircraft and their component parts by that date.

¶35     Other provisions of the Agreement support the latter interpretation. Section 11, titled "Transitional Assistance," states: "Buyer is solely responsible for doing any and all inspections or investigations of the King Air Aircraft *prior to closing*" (emphasis added). Why would Edwards have a right to conduct "any and all inspections or investigations of

the King Air Aircraft prior to closing" if that right terminated when he signed the Agreement? Section 13, titled "Disclosures by Seller/Due Diligence by Buyer/Mutual Cooperation between Seller and Buyer," provides: "The Buyer and the Buyer's agents have had *and will continue to have* full access to the Business and financial records pertaining to the Purchased Assets, *including their past operation*" (emphases added). Section 14, titled "Representations and Warranties," states: "*At closing* Seller warrants to Buyer: . . . (d) . . . Buyer has conducted inspections and investigations to determine whether or not the Sellers' warranties contained in this Agreement are true, and has stated no objections to Seller" (emphasis added, paragraph break omitted). Again, the question arises: If Edwards' right to inspect the aircraft terminated when he signed the Agreement on May 23, 2002, then why would he continue to have full access to the records, why would he "conduct[ ] inspections and investigations to determine whether or not the Sellers' warranties contained in this Agreement are true," and why would he indicate to Corporate Air "[a]t closing" that he has no objections to the aircraft?

¶36 Of course, these are rhetorical questions. The point is that the foregoing provisions of the Agreement, taken together, are susceptible to two reasonable but conflicting meanings. We certainly cannot state, as a matter of law, based on the language, that Edwards' right to inspect terminated on May 23, 2002. Accordingly, we hold that the Agreement is facially ambiguous on this point and that it is necessary for a fact-finder to determine what the parties intended with regard to Edwards' right to inspect the aircraft.

## B. Closing Date

21

¶37 Aside from whether the Agreement permitted Edwards to inspect the aircraft after May 23, 2002, Edwards also contends that he rejected the aircraft within the timeframe permitted by the Agreement. Section 18 governs the closing date and states:

> This Agreement and the sale and purchase transaction shall close no later than fourteen (14) days, inclusive of weekends, from the date of execution. Closing of the aircraft purchase shall occur at an aircraft title company selected by Buyer. Closing of the sale of other assets shall occur at American Title and Escrow in Billings, Montana. Both closings shall occur simultaneously. Both parties agree to tender to the title companies all documents and monies necessary to the closing. Extension of this closing date requires the written consent of both parties.

¶38 The parties executed the Agreement on May 23, 2002. Fourteen days from that date was June 6, 2002. Edwards rejected BB-198 by letter dated June 19, 2002, and rejected BB-279 by letter dated July 3, 2002. These dates are clearly past the June 6, 2002 deadline. However, both parties acknowledge the language of Section 18 stating that the closing date can be extended by the written consent of both parties. While Corporate Air contends that there was no such extension and that the parties agreed to close on both the FBO and the two aircraft on May 30, 2002, Edwards Jet states that there are "numerous writings" in the record reflecting an "executed agreement to extend [the deadline]." Accordingly, we turn to the question of whether the parties effectively extended the closing date.

¶39 Edwards Jet references a series of letters that allegedly constitute a written record of an agreement to extend the closing date. The first letter, dated June 3, 2002, from Corporate Air to Edwards Jet, states:

> This letter is to confirm that on May 30, 2002, an agreement was made concerning the financing Edwards Jet Center Montana, Inc. was to

obtain from Key Bank. It is my understanding that both parties agreed that in the event Buyer could not obtain financing by 12:00 p.m. on Monday, June 3, 2002, Buyer would pay Seller interest in the amount of $328.00 per day.

This *per diem* interest was to begin on Monday, June 3, 2002, and is payable that day and each day thereafter until financing from Key Bank is secured.

¶40 The next letter, dated June 4, 2002, from Edwards Jet to Corporate Air, acknowledges receipt of the June 3, 2002 letter and states, in pertinent part:

Please allow this letter to confirm the agreement to pay $328.00 per day for each day that closing is delayed through the fault of the Buyer or Key Bank.

We did not close on Monday because of Key Bank's delay. You are $328.00 to the good.

Yesterday afternoon we were able to test fly the second airplane. Neither airplane completely conforms to the warranty that all systems are to be operational on the date of closing.

We also need to accomplish a complete review of the log books now that the aircraft have been flown.

¶41 Another letter from Edwards Jet to Corporate Air dated June 4, 2002, discusses an inspection of BB-279 scheduled for the following day and notes that "[i]t would sure help speed up the process if the flight manuals, the 337 Addendum to the flight manuals (flight manual supplements), together with the log books could be made available at [Edwards Jet Center's] shop tomorrow." A letter from Edwards Jet to Corporate Air dated June 11, 2002, states that Edwards Jet was "arranging for translation of the log books [for BB-279] in light of the problem with the other aircraft." The letter also includes Edwards Jet's inspection report on BB-279. Finally, a letter from Corporate Air to Edwards Jet dated June 14, 2002, discusses loan financing documents and states: "I would appreciate

it if you could confirm to my office that you have received the package from Key Finance. If so, please proceed to close this transaction as soon as possible."

¶42 These letters suggest that the parties may have extended the closing date on the aircraft. Corporate Air's June 3 letter indicates that the parties agreed Edwards Jet would pay $328.00 per day if Edwards Jet could not obtain financing by noon that day. Edwards' June 4 letter confirms an agreement to pay $328.00 per day "for each day that closing is delayed through the fault of the Buyer or Key Bank." Several letters discuss ongoing inspections on either side of the June 6 deadline; and Corporate Air's June 14 letter expresses a desire "to close this transaction as soon as possible." On the other hand, Corporate Air provides a letter it sent to Edwards Jet, in which Corporate Air asserted that Edwards was in default for his "failure to close and pay the full purchase price within fourteen (14) days of execution, as agreed."

¶43 We conclude that it cannot be said, as a matter of law, based on these letters, that the parties did or did not give "written consent" to extend the closing date as contemplated by Section 18 of the Agreement. As with the right to inspect, this is a disputed matter that must be resolved by a fact-finder.

## IV. Conclusion

¶44 We hold that the District Court erred in granting summary judgment in favor of Corporate Air on the breach-of-contract and express-warranty claims. The Agreement is ambiguous on its face as to whether Edwards is accepting the aircraft "as is" on the date of signing or whether he has a right to inspect (and, correspondingly, reject) the aircraft during the period between executing the Agreement and the closing date. There also are

24

genuine issues of material fact as to whether the parties extended the closing date. Accordingly, we reverse the District Court's judgment as to these claims.

¶45 **_Issue 2. Did the District Court err in denying summary judgment to Edwards Jet on its breach-of-contract and express-warranty counterclaims?_**

¶46    Edwards Jet contends that the District Court erred in denying its motion for partial summary judgment on its breach-of-contract and express-warranty counterclaims. In Edwards Jet's view, the material facts occurring after May 23, 2002, are undisputed and Edwards lawfully rejected the planes. For the reasons discussed in Issue 1, however, denial of Edwards Jet's motion on these claims was proper. The Agreement is ambiguous as to whether Edwards had a right to inspect the aircraft after signing the Agreement on May 23, 2002, and it is unclear whether Edwards rejected the aircraft within the timeframe allowed by the Agreement. Because these matters cannot be resolved on summary judgment, it is likewise impossible to determine at this stage of the litigation whether Edwards lawfully rejected the aircraft. Moreover, the parties' briefs are replete with disputed factual issues precluding summary judgment for either party. Accordingly, we hold that the District Court did not err in denying Edwards Jet's motion for partial summary judgment on its breach-of-contract and express-warranty counterclaims.

¶47 **_Issue 3. Did the District Court err in granting Edwards Jet summary judgment on Corporate Air's tort claims?_**

¶48    The District Court granted Edwards Jet's motion for summary judgment on Corporate Air's tort claims and dismissed those claims on the ground that Corporate Air had relied on a contract theory of relief and, thus, had elected to be made whole under the

Agreement. Corporate Air contends that the District Court erred because tort liability can coexist with contract liability and because recovery on a contract theory does not necessarily preclude recovery on tort theories, such as fraud. Edwards Jet responds that the District Court properly dismissed the tort claims because Corporate Air cannot be allowed to make a "double recovery." Edwards Jet also claims that this is a UCC case and that tort damages are not available in such cases, save for rare circumstances where a separate tort claim arises from the contractual relationship.

¶49     It is possible to allege several individual causes of action based on the same injury. *See Thiel v. Taurus Drilling Ltd. 1980-II*, 218 Mont. 201, 210, 710 P.2d 33, 38 (1985). "Under certain circumstances, potential liability in tort may coexist with a liability in contract. When the facts warrant either form of action, an injured party has the right to elect which form of action he will pursue." *Thiel*, 218 Mont. at 209, 710 P.2d at 38. "In common contract actions, tort-type damages are not available for breach of the implied covenant of good faith and fair dealing. They are, however, available for traditional contract-related torts such as fraud, fraudulent inducement, and tortious interference with a contract." *Story v. City of Bozeman*, 242 Mont. 436, 451, 791 P.2d 767, 776 (1990); *see also Harrington v. Holiday Rambler Corp.*, 176 Mont. 37, 46, 575 P.2d 578, 583 (1978) ("[A]n action on the contract and an action for fraud or misrepresentation in the inducement of the contract are not incompatible."); *Fall Sand & Gravel Co. v. Western Concrete Inc*, 270 F. Supp. 495, 500 (D. Mont. 1967) (" 'A right of action on a contract and for fraud in inducing plaintiff to enter into such contract may exist at the same time, and a recovery on one of the causes will not bar a subsequent action on the other.' "

(quoting *Bankers Trust Co. v. Pacific Employers Ins. Co.*, 282 F.2d 106, 110 (9th Cir. 1960)).

¶50    Corporate Air cites these cases and a few others for the proposition that its fraud-based claims are not precluded by the fact that it is also making a contract claim arising out of the same events.  We agree with Corporate Air on this point and conclude that the rationale adopted by the District Court for dismissing all of Corporate Air's tort claims—namely, that recovery under a contract theory precludes recovery under a tort theory—is not necessarily true for all of those claims.  In other words, Corporate Air's tort claims must be considered individually and cannot all be dismissed under this blanket rationale. However, given the parties' limited arguments on this issue, and given the disputed factual issues discussed above, we will not decide here whether Corporate Air's tort claims do, in fact, survive summary judgment.  That is an issue to be considered again by the District Court on remand after proper briefing by the parties.  Rather, we only hold that the District Court erred in its wholesale grant of summary judgment to Edwards Jet on all of Corporate Air's tort claims based on the single rationale that Corporate Air's contract claims and tort claims were mutually exclusive.  We reverse the District Court's judgment on this issue and remand the matter to the court for reconsideration.

¶51    ***Issue 4.  Did the District Court err in denying Corporate Air's discovery request for A. Clifford Edwards' financial records?***

¶52    Lastly, Corporate Air contends that the District Court erred in ordering that Edwards did not have to produce his personal financial records pursuant to Corporate Air's discovery request.  Edwards Jet's entire response to this contention consists of a

27

short footnote in its reply brief in which Edwards Jet acknowledges this cross-appeal issue, asserts that the issue is "moot," and adds that the District Court, in any event, did not abuse its discretion. Edwards Jet does not explain why the issue is moot; however, we note that in November 2003, the District Court ordered Edwards to submit the requested financial records to the District Court under seal pursuant to M. R. Civ. P. 26(c)(8), and it appears that Edwards did so. Nevertheless, because the records apparently have not been provided to Corporate Air, we will address whether the District Court erred in not permitting discovery of the records.

¶53 In its November 20, 2003 memorandum and order, the District Court reasoned, based on § 27-1-221(7), MCA, that "[u]ntil a jury determination is made that Corporate Air's claim for punitive damages is legitimate and will survive trial, the discovery of Mr. Edwards' financial information is premature at this juncture." Yet, § 27-1-221(7), MCA, speaks to the *admissibility* of financial evidence at trial. It does not speak to whether such information is *discoverable* pretrial. Moreover, Corporate Air directs our attention to the reasoning of the United States District Court for the District of Montana in *Baker v. CNA Ins. Co.*, 123 F.R.D. 322 (D. Mont. 1988):

> The court is acutely aware of the rule of law that any evidence of the financial condition of a party is only relevant to the issue of punitive damages, and that such evidence is admissible only after the adverse party has established a *prima facie* case that punitive damages are appropriate. Mont. Code Ann. § 27-1-221 (1987). CNA's reliance on that rule of law in the present context is misplaced. The issue presented concerns the pretrial discoverability of information relating to a party's financial status, not its admissibility.
>
> Ordinarily, Fed.R.Civ.P. 26(b) does not permit the discovery of facts concerning a party's financial status since such matters are not relevant, nor can they reasonably be expected to lead to the discovery of admissible

28

evidence. Where a claim for punitive damages is made, however, a party's financial status is relevant to the subject matter of the action and thus a proper subject of pretrial discovery. *See*, *Bergeson v. National Surety Corporation*, 112 F.R.D. 692 (D. Mont. 1986); *see also*, *Vollert v. Summa Corporation*, 389 F.Supp. 1348 (D. Haw. 1975); *Holliman v. Redman Development Corporation*, 61 F.R.D. 488 (D. So.Car. 1973).

It is elemental that the claimant must first prevail on the issue of liability and further establish that the adverse party's conduct was of such a nature that punitive damages would be justified, before evidence of the financial condition of the adverse party would be relevant. The existence of these issues, however, does not preclude the claimant from adequately preparing his case as to damages. The determination of whether evidence of the financial condition of a party is admissible is to be made during trial upon proper motion by that party. Therefore, it is not premature for Baker to demand discovery of information of the financial status of CNA, rather it is necessary that Baker have pretrial access to that information.

*Baker*, 123 F.R.D. at 330.

¶54 The District Court reasoned that "[w]hile *Baker* stands for the authority that it is not necessary for a plaintiff to make a prima facie showing of punitive damages before a defendant's financial information is discoverable, the holding did not intend for the discovery of individual financial records by merely filing a complaint pleading actions in which punitive damages may be awarded." While this may be true, the case at hand is now long past the pleadings stage. We hold that if Corporate Air's claim for punitive damages can survive summary judgment on remand, Corporate Air is then entitled to discovery of Edwards' financial information for purposes of preparing its case as to damages (unless Edwards, at that point, can establish some other legal basis for keeping the records under seal). Furthermore, upon motion by Edwards, the District Court may enter an appropriate protective order so that this information otherwise remains confidential. We need not, and thus do not, express a view as to whether financial

29

information of this nature is discoverable *prior* to a party's surviving a motion for summary judgment on a punitive damages claim.

## CONCLUSION

¶55 We hold that the District Court erred in granting summary judgment to Corporate Air, but did not err in denying summary judgment to Edwards Jet, on the parties' respective breach-of-contract claims and on Edwards Jet's express-warranty counterclaim. Neither party is entitled to summary judgment on these claims. We further hold that, for the reasons set forth above, the court must reconsider its rulings (1) on whether Edwards Jet is entitled to summary judgment on each of Corporate Air's tort claims and (2) whether Corporate Air is entitled to discovery of A. Clifford Edwards' financial information. We accordingly reverse the District Court's judgment; vacate the District Court's orders relating to damages, attorney's fees, and costs; and remand this matter for further proceedings consistent with this Opinion.

¶56 Affirmed in part, reversed in part, and remanded for further proceedings.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS