No. 88-469

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

LYLE A. WATSON, d/b/a LAW REALTY,

        Plaintiff and Appellant,

  -vs-

BASIL R. FULTZ,

        Defendant and Respondent.

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Joel Roth, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        K. Dale Schwanke; Jardine, Stephenson, Blewett &
        Weaver, Great Falls, Montana

    For Respondent:

        Linnell, Newhall & Martin; Norman L. Newhall, Great
        Falls, Montana

Submitted on Briefs: Aug. 31, 1989

Decided: October 17, 1989

Filed:

_____
           Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Plaintiff Watson sued defendant Fultz for a real estate commission on a sale of Fultz's farm near Geraldine, Montana. Sitting without a jury, the District Court for the Eighth Judicial District, Cascade County, entered judgment for Fultz. Watson appeals. We affirm.

The issues are:

1. Did the District Court err in ruling that Watson was not entitled to a real estate commission from Fultz?

2. Did the District Court err in awarding Fultz attorney fees and costs?

In June 1984, Fultz placed an ad in the Great Falls Tribune for the sale of his 5,000-acre farm. He intended to exchange his farm on a tax-free basis for another farm where he might pursue a cattle operation in addition to growing grain. Although Fultz did not list his farm with any realtors, several realtors, including Watson, attempted to locate purchasers for the farm.

By November of 1984, Fultz, with the assistance of a realtor other than Watson, had located a farm and ranch in Big Horn County which he wished to purchase. Fultz signed a Buy/Sell Agreement on the Big Horn County property on December 4, 1984. He entered into a standard listing contract with Watson for the sale of the Fultz farm two days later. As the District Court found, the contract included the following pertinent provisions:

> a. The selling price shall be "One Million Nine Hundred Thousand Dollars net to Seller and One Hundred Thousand Dollars to Law Realty for a total of Two Million Dollars."
>
> b. The selling price shall be "paid in cash at time of close."
>
> c. The agreement "begins on 12-6-84 and expires at midnight on 1-6-85."

d. "This listing is subject to Fultz being able to satisfactory [sic] trade the above lands for lands in Big Horn Co. on a tax free exchange."

e. "This sale includes all lands."

The listing contract was on a form supplied by Watson. Watson crossed out the standard form language providing for exclusivity of contract and typed in the words, "this is a non-exclusive listing."

By December 6 and 7, 1984, Watson had obtained written offers to purchase portions of Fultz's farm from Dan Roddy and Gene McKeever, whom he had located before getting the listing contract with Fultz. These offers differed from the terms of sale in the listing contract in several aspects. They were offers to purchase less than all of Fultz's farm and they both required Fultz to allow thirty days beyond January 15, 1985, for completion of financing. The offers also were contingent upon the buyers being able to obtain loans. Fultz signed counteroffers on December 14, 1984, which made the following changes to the offers: they deleted the provision allowing thirty days beyond January 15, 1985, for completion of financing; they inserted a provision that each sale was subject to all of Fultz's farm land being sold; and they inserted a provision that the "Federal Land Bank must have a commitment from Spokane by December 31, 1984 [for financing]." McKeever refused to accept Fultz's counteroffer.

On December 28 and 29, 1984, Watson obtained three new offers for a portion of the Fultz farm. The total acreage covered by these three offers did not include 800 acres of the farm. The offers, by their terms, were good for five days. Each of these provided that the offer was "subject to finance which

3

will be confirmed by 15 Jan. 1985." Fultz refused to accept the offers.

On January 4, 1985, Fultz called Watson's office and left a message that he did not want Watson representing him any longer, that it was "taking too long." Fultz met with Watson later that day.

On January 6, 1985, Watson was able to obtain an offer from John Bowman for the remaining 800 acres of the Fultz farm. The offer was contingent upon Watson taking a lesser commission on the sale and then making a resale of the property. This part of the agreement was not disclosed to Fultz. Watson was able to obtain extension agreements from two of his December 28 and 29 buyers, but the third buyer rescinded his offer in writing.

On January 8, 1985, Fultz met with his attorney and Watson. Fultz refused to sign the latest offers on his farm. This suit resulted. After a one-week trial, the District Court made comprehensive findings and conclusions and entered judgment for Fultz.


I

Did the District Court err in ruling that Watson was not entitled to a real estate commission from Fultz?

Watson makes several arguments under this issue. He first asserts that he is entitled to a commission because Fultz prematurely terminated his authority to sell Fultz's farm.

The findings of the District Court contain nothing about Fultz's call to Watson's office on January 4, 1985, in which he allegedly terminated the contract. However, as Fultz points out, Watson testified that after his meeting with Fultz later that day, he went on with the understanding that the listing agreement was still in effect. Additionally, Fultz met with one of Wat-

4

son's buyers on January 6. We conclude that the District Court did not err in omitting any finding that Watson's authority had been prematurely terminated.

The listing contract between Watson and Fultz contained the following clause which Watson typed in:

> This listing is subject to Fultz being able to satisfactory [sic] trade the above lands for lands in Big Horn Co. on a tax free exchange.

Watson argues that an objective standard for a satisfactory trade should be used. The District Court found that since the listing contract was drafted by Watson, any ambiguities must be construed against him and in favor of Fultz. It found that "[t]he term 'satisfactory' is a subjective standard rather than a reasonable man standard." We agree. Fultz testified that the trade arranged by Watson was not satisfactory to him because his accountant told him that the tax consequences to him of the exchange would be in the range of $80,000 to $100,000. We conclude that Fultz's testimony was sufficient to show that the trade arrangement was not satisfactory to him and thus did not meet the contract requirement set forth in the clause printed above.

Watson's next argument is that he did not breach his fiduciary duty to Fultz by failing to disclose his side agreement with Bowman. Under that agreement, Watson would forego $30,000 of his sales commission on the portion of Fultz's farm sold to Bowman until he resold that portion of the farm for Bowman. The District Court found that Watson thereby breached his fiduciary duty to Fultz because he acquired a personal stake in the sale by which his "personal interests became paramount to the interests to Fultz." This finding is supported by this Court's statement in Lyle v. Moore (1979), 183 Mont. 274, 277, 599 P.2d 336, 337:

> This fiduciary relationship between a broker and his client has been found to encompass a

5

"duty of full disclosure" by a number of courts.

We hold that the finding that Watson breached his fiduciary duty to Fultz is not clearly erroneous.

Watson's final argument under this issue is that the offers he produced did not vary substantially from the terms of the listing contract. However, Watson did not find buyers for all of the farmland until after the listing agreement expired on January 6, 1985. Watson did not come up with a "satisfactory trade" on a "tax free exchange." Watson did not arrange cash sales, but sales dependent upon financing which would not, by the terms of the offers, be certain until after the listing had expired. We agree with the District Court that these differences constituted substantial variation from the terms of the listing contract.

In summary, we hold that the District Court did not err in ruling that Watson was not entitled to a real estate commission from Fultz.

## II

Did the District Court err in awarding Fultz his attorney fees and costs?

The listing contract between Watson and Fultz provided that,

> In case you engage an attorney's services in regards to this contract, or in case of suit or action on this contract, I/we agree to pay collection costs, court costs and reasonable attorney fees, both trial and appellate, incurred by you, if you prevail.

The contractual right to attorney fees is reciprocal. Section 28-3-704, MCA.

The hearing on attorney fees to be awarded to Fultz was set in the District Court's findings, conclusions, and order. That document stated, on its final page:

6

> IT IS HEREBY ORDERED that a hearing to deter-
> mine Defendant's attorney's fees is set for
> the 16th day of March, 1988, at 2:30 o'clock
> P.M. Thereafter, a final judgment will be
> entered.

Watson's attorney states that he did not notice this portion of the findings, conclusions, and order. He also did not notice the mention of the hearing date in Fultz's March 3, 1988, motion to amend findings, with which he was served. When he failed to appear at the March 16 hearing, he was summoned to the courtroom. The court refused his request for a continuance and allowed Fultz to present his evidence in support of his claim for $27,888.75 in attorney fees and $637.60 in costs.

Watson argues that even if this Court upholds the lower court's ruling on Issue I, it should reverse the award of attorney fees and costs to Fultz. He asks for a new trial on attorney fees. He argues that any negligence of his attorney in failing to notice that the hearing date had been set should not be imputed to him.

In Griffin v. Scott (1985), 218 Mont. 410, 413, 710 P.2d 1337, 1339, we held that the district court did not abuse its discretion in ruling that an attorney's failure to read his mail for five weeks was not excusable neglect under which relief from judgment was available pursuant to Rule 60(b), M.R.Civ.P. Similarly, in this case we hold that the District Court did not abuse its discretion in ruling that Watson's counsel's failure to carefully read the court's findings, conclusions, and order was not excusable neglect.

Watson also states that Fultz failed to supplement his answers to interrogatories with the name of the expert witness called to testify in support of the amount of attorney fees claimed. However, the interrogatories and the pre-trial order requiring supplemental answers to interrogatories were directed

7

to witnesses at the trial in this matter, not to those at the post-trial hearing on attorney fees. We hold that Fultz was not required to supply Watson with the name of his witness at the hearing on attorney fees.

Affirmed and remanded to the District Court for a determination of the amount of attorney fees to be awarded to Fultz on the appeal, pursuant to the parties' contract.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

8