FILED

November 24 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 08-0123

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 399

KERMIT ANDERSEN,

        Plaintiff and Appellant,

   v.

N. PETER SCHENK,

        Defendant and Appellee.

APPEAL FROM:    District Court of the Twentieth Judicial District,
                  In and For the County of Sanders, Cause No. DV-2006-101
                  Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Robert K. Baldwin, Trent M. Gardner, Goetz, Gallik & Baldwin, P.C.,
                Bozeman, Montana

        For Appellee:

                Charles E. Hansberry, Elena J. Zlatnik, Garlington, Lohn & Robinson,
                PLLP, Missoula, Montana

Submitted on Briefs:  January 7, 2009

Decided:  November 24, 2009

Filed:

_____
                            Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Kermit Andersen is a licensed real estate broker. He filed the instant action in the Twentieth Judicial District Court, Sanders County, to collect a commission on the sale of N. Peter Schenk's 10,000-acre ranch, known as the Whiskey Trail Ranch. The problem is that Schenk's alleged promise to pay this commission was not made in writing, and Schenk thus asserted the statute of frauds (§ 28-2-903, MCA) as a defense to Andersen's claim. The District Court agreed with Schenk and entered judgment in his favor. Andersen now appeals. We affirm in part and remand for further proceedings.

## BACKGROUND

¶2    This case was resolved in the District Court on cross-motions for summary judgment. In this connection, it is important to note that at the summary judgment stage, the court does not make findings of fact, weigh the evidence, choose one disputed fact over another, or assess the credibility of witnesses. Rather, the court examines the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits to determine whether there is a genuine issue as to any material fact relating to the legal issues raised and, if there is not, whether the moving party is entitled to judgment as a matter of law on the undisputed facts. *See* M. R. Civ. P. 56(c); *Corporate Air v. Edwards Jet Center*, 2008 MT 283, ¶ 28, 345 Mont. 336, 190 P.3d 1111. This Court employs the same approach in reviewing de novo a district court's decision on a motion for summary judgment. *See Corporate Air*, ¶ 24.

¶3    The record presented by the parties in support of their respective motions for summary judgment reflects the following. In 2002, Schenk's wife Jane initiated divorce

proceedings in Illinois state court. One of the marital assets was the Whiskey Trail Ranch, which is located within the exterior boundaries of the Flathead Indian Reservation. Schenk preferred not to sell the ranch, which was titled in his name, and instead hoped to obtain an offer or valuation that he could then use for purposes of buying out Jane's marital interest. He determined that he would not sell the ranch unless he received an offer of at least $10 million.

¶4 Schenk decided to contact the Confederated Salish and Kootenai Tribes about the possible sale of the ranch. He had previously promised former Tribal Council Chairman Mickey Pablo that if he was ever considering selling the ranch, he would give the Tribes the first opportunity to purchase it. Pablo had since passed away, and Schenk had no other contacts with the Tribes, but he believed that Andersen did. Thus, Schenk contacted Andersen about introducing him to the current Tribal Council chairman so that Schenk could ascertain whether the Tribes were still interested in purchasing the ranch and, if so, what price they would offer.

¶5 Andersen has been a licensed real estate broker since the mid-1980s, though his experience in the real estate business dates back to the early 1960s. Andersen agreed to make the introduction, but there was no discussion between him and Schenk about compensation or a commission, and they did not enter into a listing agreement for the sale of the ranch. Andersen facilitated a few meetings between Schenk and several tribal members; however, the Tribes and Schenk ultimately dealt with each other directly.

¶6 Schenk's negotiations with the Tribes were unsuccessful, which he claims was due in large part to Jane's separate negotiations with the Tribes and her efforts in the Illinois

3

divorce proceedings to force Schenk to sell the ranch for less than $10 million. The offers made by the Tribes to Schenk and Jane during this period were in the $4 to $5 million range, and Schenk concluded that the negotiations were going nowhere. He thus decided in the summer of 2005 to start marketing the property nationally. He retained a different real estate agent for this purpose.

¶7    Around this same time, Andersen called Schenk regarding an acquaintance, Michael Maddy, who might be interested in purchasing the ranch. Although Andersen had heard that Schenk was still negotiating with the Tribes, he inquired whether Schenk would be willing to sell to someone else. Schenk indicated that he would be, and he gave Andersen permission to show Maddy the ranch. According to Schenk, Andersen also inquired during this call whether Schenk would pay him a commission, and Schenk replied: "If you can get me $10 million, I will pay you a commission." No written contract to this effect was ever executed, however.

¶8    Andersen and Maddy viewed the ranch from a helicopter flyover. Thereafter, in mid-August 2005, Schenk, Maddy, and Andersen had several meetings to discuss the sale. According to Andersen, Schenk told him at the conclusion of one of these meetings that he would not pay Andersen a commission if the Tribes bought the property, but "if you put this deal together, you will get your commission and it will be a darn good one." Presumably, Schenk was referring to the deal with Maddy. Again, no written contract was executed.

¶9    On September 13, 2005, the Tribes made an offer of $5.7 million to Jane, who then filed a motion in the Illinois court requesting that Schenk be ordered to accept this

4

offer. Meanwhile, on September 20, Maddy wrote up and handed Andersen an offer of $6.2 million. This offer, however, was not transmitted to Schenk. Rather, Andersen drove it 70 miles south to Missoula, where he presented it to Jane and her counsel, who in turn rejected the offer. Andersen reported back to Maddy, who then faxed an offer of $6.5 million directly to Schenk. The following day (September 21), the Illinois court ordered Schenk to accept Maddy's offer; and while Schenk questioned the enforceability of such an order, he nevertheless complied so as to avoid being held in contempt. He signed and faxed the papers directly to Maddy.

¶10 Maddy had difficulty financing the purchase, which Schenk evidently had been anticipating. Schenk figured that while Maddy was attempting to line up the financing, Schenk would search for a buyer willing to pay more than $6.5 million; thus, when the sale to Maddy fell through, Schenk could sell the ranch at or closer to his original asking price of $10 million. To that end, Schenk twice agreed to extend the closing. Notably, unbeknownst to Schenk, Andersen was assisting Maddy during this period in trying to either secure the necessary financing or sell the ranch to the Tribes. Ultimately, however, Maddy (through another broker) met an investor who was willing to finance the purchase in exchange for an equity position. Closing took place at the end of February 2006.

¶11 Andersen commenced the present action on June 13, 2006, raising six claims, all of which related to Schenk's alleged promise to pay Andersen a commission on the sale of the ranch to Maddy: breach of contract, breach of the implied covenant of good faith and fair dealing, actual fraud or negligent misrepresentation, constructive fraud, promissory estoppel, and unjust enrichment. (He subsequently dropped the promissory

estoppel and unjust enrichment claims.) Andersen sought compensatory damages of not less than $325,000, as well as punitive damages. Schenk filed an answer denying Andersen's allegations and raising several affirmative defenses, including statute of frauds, unclean hands, condition precedent, and the economic loss doctrine. Schenk denied that Andersen was his broker and that the parties had an agreement for the payment of a commission. However, as an alternative pleading, if Andersen were found to be Schenk's agent, Schenk asserted two counterclaims: breach of fiduciary duty and constructive fraud. He also made a counterclaim for punitive damages.

¶12 The parties eventually filed cross-motions for summary judgment. Andersen sought partial summary judgment on his breach of contract claim, Schenk's statute of frauds, economic loss, and condition precedent defenses, and Schenk's counterclaims, while Schenk sought summary judgment as to all of Andersen's claims plus his unclean hands and economic loss defenses. Both sides filed numerous (and well-researched) briefs in support and opposition to these motions. The District Court held a hearing in November 2007 and, on February 6, 2008, entered an order granting Schenk's motion. The court reasoned that under the statute of frauds, an agreement authorizing or employing an agent or broker to sell real estate for compensation or a commission must be in writing, and since no such writing existed here, all of Andersen's claims failed. The court entered final judgment on February 15, 2008, dismissing Andersen's claims and Schenk's counterclaims with prejudice. Andersen now appeals.

**ISSUES**

¶13 There are two issues on appeal:

1. Is Schenk entitled to summary judgment on Andersen's contract claims?

2. Is Schenk entitled to summary judgment on Andersen's tort claims?

## STANDARD OF REVIEW

¶14 As noted above, we review a district court's ruling on a motion for summary judgment de novo, applying the criteria set forth in M. R. Civ. P. 56. *Arnold v. Yellowstone Mountain Club, LLC*, 2004 MT 284, ¶ 12, 323 Mont. 295, 100 P.3d 137. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M. R. Civ. P. 56(c).

## DISCUSSION

¶15 *Issue 1. Is Schenk entitled to summary judgment on Andersen's contract claims?*

¶16 It is well-settled that "an agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation or a commission" is "invalid unless the agreement or some note or memorandum of the agreement is in writing and subscribed by the party to be charged or the party's agent." Section 28-2-903(1)(e), MCA. Indeed, this has been the law of this state for over 100 years. *See* § 2185, Civil Code of Montana (1895). In *Gantt v. Harper*, 82 Mont. 393, 401-02, 267 P. 296, 297 (1928), this Court observed that

> [o]ur statute of frauds requires a note or memorandum in writing, subscribed by the party to be charged, or his agent, as a condition precedent to recovery of a broker's commission upon an agreement authorizing or employing an agent or broker to purchase or sell real estate. (Sec. 7519,

Rev. Codes 1921.) This statute has frequently been considered and applied by this court and its provisions are held to be mandatory . . . .

Likewise, in *Hart v. Billings Public Stockyards*, 157 Mont. 345, 355, 486 P.2d 120, 125 (1971), this Court stated that "[a]ny action to collect a broker's commission for the sale of real estate must be founded on a written instrument." This stringent requirement of a written instrument derives from the plain language of the statute itself, which as noted states that an agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation or a commission is "invalid" unless the agreement or some note or memorandum thereof is in writing and subscribed by the party to be charged or the party's agent. Section 28-2-903(1)(e), MCA. Accordingly, this Court has repeatedly rejected claims for a broker's commission founded on alleged agreements that were not in writing.[1] *See e.g. King v. Benson*, 22 Mont. 256, 56 P. 280 (1899); *Newman v. Dunleavy*, 51 Mont. 149, 149 P. 970 (1915); *Dick v. King*, 73 Mont. 456, 236 P. 1093 (1925); *Skinner v. Red Lodge Brewing Co.*, 79 Mont. 292, 256 P. 173 (1927); *Featherman v. Kennedy*, 122 Mont. 256, 200 P.2d 243 (1948); *Reilly v. Maw*, 146 Mont. 145, 405 P.2d 440 (1965); *Meech v. Cure*, 165 Mont. 49, 525 P.2d 546 (1974); *cf. Roscow v. Bara*, 114 Mont. 246, 135 P.2d 364 (1943); *Carnell v. Watson*, 176 Mont. 344, 578 P.2d 308 (1978); *Kraft v. Hodson*, 254 Mont. 262, 836 P.2d 1234 (1992).

¶17 Andersen concedes that he and Schenk did not execute a listing agreement—i.e., "a written agreement between a seller and broker for the sale of real estate, with the terms

---

[1] Notably, in this regard, the Board of Realty Regulation considers "failing to document in writing and obtain signatures by the parties to all agreements" to be "unprofessional conduct." Admin. R. M. 24.210.641(5)(l) (2007).

and conditions set out in the agreement," § 37-51-102(14), MCA. He contends, however, that (1) the statute of frauds was nevertheless satisfied or (2) the statute of frauds is inapplicable. Andersen's arguments under both of these theories are premised on certain statements Schenk made in his discovery responses and deposition testimony. In particular, Andersen points to Schenk's answer to Interrogatory No. 7, where Schenk describes the telephone conversation with Andersen in the summer of 2005 and states: "In this conversation, Plaintiff asked Defendant if he would pay him a commission. Defendant responded to Plaintiff that, if Mr. Maddy purchased the [ranch] for $10 million, he would pay him a commission." Andersen also points to Schenk's answer to Interrogatory No. 26, where Schenk states: "As outlined in the Answer to Interrogatory No. 7, Defendant did make a statement to Plaintiff at the time Plaintiff informed him of Mr. Maddy that, if the sale closed at his asking price of $10 million, he would pay Plaintiff a commission." In addition, Andersen points to two passages from Schenk's deposition. In one, Andersen's counsel asked, "So you did agree to pay Kermit a commission, at least under certain circumstances?" to which Schenk replied, "Had a sale occurred over $10 million, I agreed to pay him a commission." In the other, Schenk likewise stated: "I had an agreement that I spoke of before: 'If you can get me $10 million, I will pay you a commission.' No further agreement."

¶18    Under his first theory, Andersen contends that the foregoing discovery responses and deposition testimony constitute a "note or memorandum" that satisfies the statute of frauds. *See* § 28-2-903(1), MCA (an agreement to pay a commission is invalid "unless the agreement *or some note or memorandum of the agreement* is in writing and

9

subscribed by the party to be charged or the party's agent" (emphasis added)). Alternatively, under his second theory, Andersen cites *Hillstrom v. Gosnay*, 188 Mont. 388, 395-96, 614 P.2d 466, 470 (1980), *Ryckman v. Wildwood, Inc.*, 197 Mont. 154, 162, 641 P.2d 467, 471 (1982), *Hayes v. Hartelius*, 215 Mont. 391, 396, 697 P.2d 1349, 1353 (1985), and *Morton v. Lanier*, 2002 MT 214, ¶¶ 17-19, 311 Mont. 301, 55 P.3d 380, for the proposition that the statute of frauds is simply not applicable where the defendant admits the existence of the alleged contract; and based on Schenk's discovery responses and deposition testimony, Andersen contends that the statute of frauds is inapplicable because Schenk admitted that he agreed to pay Andersen a commission.

¶19 Schenk, in response, challenges these arguments on several different grounds. First, he points out that Andersen has cited no Montana authority holding that discovery responses and deposition testimony can constitute a "note or memorandum" under § 28-2-903(1), MCA. Indeed, Andersen cites *Bower v. Jones*, 978 F.2d 1004, 1008-09 (7th Cir. 1992) (applying Illinois law), and *Rogers v. Savings First Mortgage, LLC*, 362 F. Supp. 2d 624, 641-42 (D. Md. 2005) (applying Maryland law), but no Montana cases. Schenk argues that allowing discovery responses and deposition testimony to satisfy the statute's writing requirement would be inadvisable (e.g., because a litigant might be forced to choose between discovery sanctions and waiving the statute of frauds defense).

¶20 Second, Schenk challenges the sufficiency of his admissions. He cites *Conagra, Inc. v. Nierenberg*, 2000 MT 213, ¶¶ 45-46, 301 Mont. 55, 7 P.3d 369, where we stated (with respect to contracts for the sale of goods) that in order to remove an oral contract from the statute of frauds, an admission must be deliberate, clear, and unequivocal and

must be a statement of fact, not a legal conclusion or opinion. We also indicated that an admission is ineffective if it was later modified or explained so as to show that the litigant was mistaken. *Conagra*, ¶ 45. Here, Schenk argues that he did not deliberately, clearly, and unequivocally admit the existence of a legally enforceable oral contract. He points out that later in his deposition, he testified that Andersen "never accepted in any way that offer that I made to pay a commission over and above $10 million. However, I thought, from my standpoint, if he accepted, it's a binding contract on my behalf." Based on this "clarification," Schenk contends that he only admitted to having made an *offer*, which Andersen did not accept, and therefore no contract arose.[2] *See* §§ 28-2-102, -301, MCA; *Daniels v. Thomas, Dean & Hoskins, Inc.*, 246 Mont. 125, 133, 804 P.2d 359, 363 (1990) (a contract requires consent, which consists of an offer and an acceptance of that offer).

¶21 Third, Schenk argues that even if he did admit the existence of an enforceable contract to pay Andersen an unspecified commission, his stated condition for payment (a sale at $10 million) was never met. We conclude that this argument is a sufficient basis for resolving Andersen's contract claims. This Court has explained that

> [t]he broker's ability to recover commissions is premised on the broker's ability to accomplish what he undertook to do in his contract of employment. The broker is not entitled to compensation for unsuccessful

---

[2] In this regard, Schenk observes that the "biggest irony" here is that Andersen is attempting to establish the existence of a contract based on a conversation he does not remember having. During his deposition, Andersen was asked: "Peter yesterday testified that he did at one point in time say that 'If you sell the ranch at $10 million, if you bring me a buyer at $10 million, I will pay you a commission.' Do you ever recall that conversation?" Andersen replied: "Not at all." Andersen did recall a different conversation that occurred a month later, in which Schenk allegedly told him that "if you put this deal [with Maddy] together, you will get your commission and it will be a darn good one." However, Schenk has not admitted making this statement.

11

efforts under his contract of employment, irrespective of how great his efforts were or how meritorious his services. It is generally necessary to refer to the specific terms of the particular employment contract in order to determine whether or not the broker's duties have been performed.

*Diehl & Assocs., Inc. v. Houtchens*, 173 Mont. 372, 377, 567 P.2d 930, 934 (1977) (citations omitted). Here, assuming for the sake of argument that Schenk's discovery responses and deposition testimony constitute a "note or memorandum" under the statute of frauds, *see e.g. Restatement (Second) of Contracts* § 133 cmt. d, § 136 cmt. b (1981) (stating that a written pleading, stipulation, or deposition may serve as a memorandum if otherwise sufficient as to contents and signature), the question then becomes whether Andersen accomplished the terms of the admitted contract. Schenk agreed to pay him a commission *if* the ranch sold to Maddy for $10 million. There is no dispute that Maddy purchased the ranch for $6.5 million. Consequently, Schenk argues, and we agree, that his obligation under this contract to pay Andersen a commission never arose.

¶22 Andersen, however, cites *Shober v. Blackford*, 46 Mont. 194, 127 P. 329 (1912), *Apple v. Henry*, 66 Mont. 244, 213 P. 444 (1923), *Barrett v. Ballard*, 191 Mont. 39, 622 P.2d 180 (1980), and *Lane v. Smith*, 255 Mont. 218, 841 P.2d 1143 (1992), for the proposition that a broker is still entitled to a commission where the property sells for less than the original asking price. In *Lane*, we observed that " ' "[w]here an agent contracts to furnish a purchaser for land at a stipulated price and such agent does furnish a purchaser whom the owner accepts, and in the negotiations of the contract the owner agrees upon and accepts a different price from that at which the agent was instructed to sell, still such agent would be entitled to his compensation." ' " *Lane*, 255 Mont. at 224,

12

841 P.2d at 1147 (quoting *Barrett*, 191 Mont. at 47-48, 622 P.2d at 185, in turn quoting

*Shober*, 46 Mont. at 206, 127 P. at 332). Likewise, in *Apple*, we said that

> [i]f the broker finds and introduces to his principal a person who is ready, able and willing to purchase or exchange upon terms acceptable to the principal, the broker has earned his commission. It is altogether immaterial that the final contract between defendant and [the buyer] was made without the presence, or even the knowledge, of plaintiff, if it resulted from the means and efforts employed by him, or that it provided different terms from those submitted to plaintiff.

*Apple*, 66 Mont. at 249, 213 P. at 445-46 (citations omitted). Andersen emphasizes our

statement in *Barrett*, 191 Mont. at 47, 622 P.2d at 185, that "the ultimate sale terms need

not be what the broker's contract states, but only that the seller and the buyer were

brought together by the broker."

¶23 We do not agree that these cases are controlling here. For starters, the seller in

each case hired the broker to procure a buyer for the property and executed a listing

agreement to that effect. In contrast, Schenk did not sign a listing agreement, and he did

not agree to pay Andersen a commission for simply procuring a buyer for the ranch.

Rather, according to the contract which we have assumed existed here, Schenk agreed to

pay Andersen a commission *if the ranch sold to Maddy for $10 million.* Andersen's

insistence that this condition is immaterial is totally without merit. While relying heavily

on *Shober* and its progeny, Andersen overlooks the following passage in that case:

> [W]here the agent is employed at a stipulated commission to procure a purchaser upon terms named, the seller reserving the right to consummate the sale, the agent has fully discharged his undertaking when he has procured a purchaser; and if, then, the seller avails himself of the services so rendered and negotiates a sale, though upon terms and conditions different from those named to the agent, the agent may recover the commission agreed upon in the contract, whether it be a fixed sum, or a

13

commission at a percentage of the selling price, or at an agreed rate per acre. *The agent may, of course, agree that he shall not receive any compensation unless the sale is made within a specified time, or at the price and upon the conditions named by the seller. He will then be held to his agreement.*

*Shober*, 46 Mont. at 208-09, 127 P. at 333 (emphasis added, citations omitted); *see also e.g. Property Brokers, Inc. v. Loyning*, 201 Mont. 309, 654 P.2d 521 (1982) (broker not entitled to commission because condition in listing agreement not met); *Watson v. Fultz*, 239 Mont. 364, 782 P.2d 361 (1989) (same); *cf. Diehl*, 173 Mont. at 379, 567 P.2d at 935 (explaining distinction between a contract requiring the broker merely to find a purchaser and a contract requiring the broker to sell, make, or effect a sale). Here, the contract that Andersen has established with Schenk's discovery responses and deposition testimony expressly conditions the payment of a commission on Maddy's purchasing the ranch for $10 million. Andersen cannot hold Schenk to an unconditional promise that Schenk has not admitted he made. Rather, Andersen's claim depends on what Schenk has admitted, and that includes the $10 million condition.

¶24 We acknowledged the view in *Shober*, and Schenk concedes its validity, that a seller should not be allowed to take advantage of his introduction to a purchaser by a broker, and reap the benefits of the sale made in consequence, and then escape all liability of paying the broker her commission because the property sold for an amount less than the price stated in the listing agreement, where the reduction was made of the seller's own accord. *See Shober*, 46 Mont. at 206, 127 P. at 332. This principle, however, is not implicated here. For one thing, there is no listing agreement—despite the significant amount of money involved, and despite the fact that Andersen was required to

get any agreement for the payment of a commission in writing (a fact of which he was aware, given his 20-plus years of experience as a licensed real estate broker). Moreover, there is no evidence in the record indicating that Schenk sold the ranch to Maddy for $6.5 million (65% of his asking price) in order to avoid paying Andersen a commission. Lastly, and critically, the admitted contract between Andersen and Schenk expressly conditioned the payment of a commission on the sale of the ranch at a particular price—a condition which was not met.

¶25 There are no genuine issues as to any material fact relating to Andersen's contract claims; and based on the law discussed above, Schenk is entitled to judgment as a matter of law on those claims. We accordingly affirm the District Court on this issue.

¶26 ***Issue 2. Is Schenk entitled to summary judgment on Andersen's tort claims?***

¶27 In his motion, Schenk sought summary judgment on all of Andersen's claims (the contract claims and the tort claims). The District Court granted Schenk's motion on the ground that "[t]here is no writing, signed by Schenk, supporting the commission agreement alleged by Andersen." Andersen then filed a Motion for Status Conference, explaining that he was unsure whether the court intended to dispose of his tort claims. He sought clarification of what the court had decided and whether any claims remained pending. Thereafter, the court entered its final judgment, dismissing "all" of Andersen's claims with prejudice. The court did not provide any additional reasoning.

¶28 There are a number of problems with the District Court's analysis. First, to the extent the court thought that Andersen's contract claims necessarily barred his tort claims, the court was incorrect, as we have recognized that under certain circumstances

15

potential liability in tort may coexist with a liability in contract. *See Corporate Air v. Edwards Jet Center*, 2008 MT 283, ¶ 49, 345 Mont. 336, 190 P.3d 1111. Second, it is true that Andersen cannot end-run the statute of frauds by seeking a broker's commission under a non-contract theory. *See Gantt*, 82 Mont. at 401-02, 267 P. at 297 (a written instrument is a "condition precedent" to the recovery of a broker's commission); *Hart*, 157 Mont. at 355, 486 P.2d at 125 ("Any action to collect a broker's commission for the sale of real estate must be founded on a written instrument."); *Meech*, 165 Mont. at 53, 525 P.2d at 548 ("[A] broker may not collect a realtor's commission absent a valid written agreement."); *cf. Featherman*, 122 Mont. at 260-62, 200 P.2d at 245-46 (allowing recovery of a commission under theories of quantum meruit or completed performance would nullify the statute of frauds); *accord Reilly*, 146 Mont. at 152, 405 P.2d at 444. However, it is not clear whether Andersen is attempting to do so here, and it is likewise unclear from the court's reasoning whether this was part of its rationale. Third, Andersen complains that the court's order does not comply with M. R. Civ. P. 52(a), which states that an order granting a motion under Rule 56 "shall specify the grounds therefor with sufficient particularity as to apprise the parties and the appellate court of the rationale underlying the ruling." For the reasons just discussed, we agree that the court's order falls short of this requirement vis-à-vis Andersen's tort claims.

¶29　Accordingly, it is necessary to vacate the District Court's February 15, 2008 Final Judgment and remand this case to that court for entry of an order, which complies with Rule 52(a), on Schenk's motion for summary judgment on Andersen's tort claims and Schenk's defenses to those claims. *See e.g. Ravalli County Bank v. Gasvoda*, 253 Mont.

399, 402, 833 P.2d 1042, 1044 (1992) ("The District Court did not adhere to Rule 52(a), M.R.Civ.P., when it failed to specify the grounds for the summary judgment ruling with sufficient particularity. Therefore, we remand this case to the District Court with instructions to proceed in accordance with this opinion.").

## CONCLUSION

¶30 We affirm the District Court's February 6, 2008 Amended Order Granting Defendant's Motion for Summary Judgment insofar as this order pertains to Andersen's contract claims. We remand for the entry of an order on Andersen's tort claims in compliance with M. R. Civ. P. 52(a) and the entry of a new final judgment.

¶31 Affirmed in part and remanded for further proceedings.

/S/ JAMES C. NELSON

We concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS