FILED

03/15/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0207

DA 21-0207

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2022 MT 53N

DAVID McCAULEY, an individual, LEADERS WITHOUT LIMITS, INC.,
a Wyoming Corporation, and PERKINS FAMILY HOLDINGS, LLC, a Montana
Limited Liability Company,

        Plaintiffs and Appellants,

    v.

CROWLEY FLECK, PLLP, a Montana Professional limited liability partnership,
GRANT S. SNELL, an individual, SCOTT D. HAGEL, an individual,
CHASE D. GIACOMO, an individual, and DOES 1-10,

        Defendants and Appellees.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                  In and For the County of Flathead, Cause No. DV-2019-918
                  Honorable Dan Wilson, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Quentin Rhoades, Rhoades Siefert & Erickson PLLC, Missoula, Montana

        For Appellees:

                Mikel Moore, Eric Brooks, Moore, Cockrell, Goicoechea & Johnson, P.C.,
                Kalispell, Montana

                              Submitted on Briefs:  February 9, 2022

                                    Decided:  March 15, 2022

Filed:

                      _____
                                  Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 David McCauley, Leaders Without Limits, Inc., and Perkins Family Holdings, LLC, (hereinafter "McCauley" unless otherwise specified)[1] appeal the Eleventh Judicial District Court's grant of summary judgment in favor of Crowley Fleck, PLLP, Grant S. Snell, Scott D. Hagel, and Chase D. Giacomo (hereinafter "Crowley" unless otherwise specified), holding that McCauley's malicious prosecution and intentional infliction of emotional distress (IIED) claims against these Defendants fail as a matter of law. We affirm.

¶3 The underlying action spawning McCauley's claims arose from a transaction between McCauley and Samuel and Joyce Perkins (the "Perkinses"), an elderly married couple living in Kalispell, concerning Perkinses' property, which included their residence and a 21-acre parcel of land. In 2014, McCauley mass-mailed letters to property owners in the Flathead area expressing his interest in purchasing their property. In response, the Perkinses contacted McCauley, despite their property being encumbered by a reverse

---

[1] McCauley notes that Appellees' briefing sometimes conflates David McCauley and Perkins Family Holdings, LLC, despite the District Court never piercing the corporate veil. While McCauley's point is understood, the distinctions between McCauley and the various corporate entities related to McCauley herein are not necessary to our resolution of the appeal.

2

mortgage they had entered a few years prior. McCauley met with them and solicited their involvement in a complex sales transaction of their property. Including a letter of intent, the transaction documents were more than 70 pages in length and were largely drafted by McCauley himself. The transaction can safely be described as extremely favorable to him.

¶4 While this transaction's legality is not before the Court here, a discussion of its terms is necessary. Some of the transaction's more remarkable provisions included:

- A residential buy-sell form agreement wherein McCauley agreed to purchase the Perkinses' property for $400,000. No appraisal in the record evidences this value; the property had been valued at $500,000 by the reverse mortgage lender a few years earlier. McCauley agreed to pay $2,000 in earnest money, $10,000 more at closing, and $388,000 through different financing prongs. Perkinses were obligated to pay all closing costs. Multiple addenda attached to the agreement superseded many of its provisions, rendering them void or misleading as initially stated.

- Title to the property would be, and was, transferred to an entity named Perkins Family Holdings, LLC, which was created by another McCauley-affiliated entity for the sole purpose of holding title to the property. Despite the use of their name, the Perkinses had no affiliation with this LLC. The justification for the existence of Perkins Family Holdings, LLC was to obfuscate the title owner of the property to avoid detection of the transfer and the potential implication of the reverse mortgage's due-on-sale clause.

- The bulk of Perkinses' theoretical proceeds from the sale was via a note that provided for payment of $74,255.24 to them ten years after the sale, in 2025. This amount earned interest at a below-market fixed rate of 3% per annum, which was non-compounding. The Perkinses would have been in their 90s at the time of payment.

- The Perkinses each signed a document appointing McCauley (the individual) as their attorney-in-fact regarding the property. The substance the power-of-attorney documents is set forth in a single sentence approximately 450 words in length, which effectively granted McCauley full control of the property.[2]

- A "rent back" agreement required the Perkinses to remain on the property for 36 months, which was consistent with a term of the reverse mortgage, paying $425 per month in rent. After the initial 3-year period, Perkinses rent would increase to $1,425 per month on a month-to-month basis. Perkinses' rent obligation for the first year was deducted from their proceeds at closing.

- Insurance on the property was to remain in the Perkinses' name, but in the event of an insurable loss, the insurance proceeds would be paid to McCauley. Perkinses remain obligated for utilities.

---

[2] A question raised by these documents is why it would be necessary for a buyer to be appointed attorney-in-fact for property passing to it upon closing. Presumably, this would provide authority for McCauley to take actions regarding the property in the name of the Perkinses to further the scheme of avoiding detection of the transaction.

- The transaction documents prohibited all parties, including the escrow agent, who would be so instructed, from informing the reverse mortgage lender of the transaction for the purpose of avoiding triggering the mortgage's due-on-sale clause.

- The documents were generally written in a meandering, longwinded manner, and include numerous legal terms of art used incorrectly or only partially correctly.

¶5 Summarizing the transaction, after closing costs and other deductions, Perkinses received $5,095.07 at closing from the agreement's $12,000 "up front" money. McCauley obtained title and "rented back" the property to the Perkinses for $425 per month for a mandatory 36-month period. After 36 months, the rental agreement converted into a month-to-month agreement at the rate of at least $1,425 per month. McCauley was required to make payments on the underlying reverse mortgage in the amount of $1,368.22 per month, but not until three years after the closing, allowing interest to accrue on that principal obligation. Ten years after closing, in late 2025, McCauley was obligated to pay off the reverse mortgage's balance and pay the note representing Perkinses' equity interest in the property, in the amount of $74,255.24, plus interest.

¶6 In February 2018, three years after closing, McCauley increased the Perkinses' rent to $1,435 per month pursuant to the transaction. Also in February 2018, the reverse mortgage lender learned of the title transfer and invoked the mortgage's due on sale clause. To satisfy the reverse mortgage obligation, McCauley, as he testified, intended to sell the property. In late February, McCauley notified Perkinses that their tenancy would terminate

at the end of March.  The Perkinses were also withholding rent, and in early March 2018, McCauley commenced eviction proceedings.

¶7      The Perkinses, now facing a possible foreclosure from the reverse mortgage lender and eviction from their home, consulted the Defendants, who agreed to represent the Perkinses *pro bono*.  In response to the eviction proceeding, Crowley filed a First Amended Verified Answer to Complaint, Affirmative Defenses, Counterclaims, and Demand for Jury Trial (Counterclaim) against McCauley asserting claims for declaratory relief, negligence/breach of fiduciary duty, negligent misrepresentation, fraud, constructive fraud, deceit, fraudulent inducement, recission of contract, violation of the Montana Consumer Protection Act, violation of the Montana Mortgage Act, and to pierce the corporate veil.

¶8      After extensive litigation, the parties entered a settlement, under which McCauley and the Perkinses mutually released all claims against each other; McCauley agreed to pay the Perkinses $13,000, concurrently upon settlement; the Perkinses agreed to vacate the property and release McCauley's obligation under the promissory note for the 2025 payment of $74,255; and each party paid/bore their own attorney fees.  The mutual release of claims specifically provided that McCauley reserved all claims against Crowley.  The District Court approved the settlement and dismissed the action with prejudice.

¶9      In September 2019, McCauley filed this action against Crowley.  The First Amended Complaint alleged:  Count 1, Defamation; Count 2, Tortious Interference; Count 3, Abuse of Process; Count 4, Malicious Prosecution; Count 5, Intentional Infliction of Emotional Distress; and Count 6, Negligent Infliction of Emotional Distress.  Crowley

6

moved for summary judgment, and McCauley subsequently abandoned his defamation, abuse of process, and negligent infliction of emotional distress claims. The District Court entered an order granting summary judgment (Summary Judgment Order) in Crowley's favor "on all of [McCauley's] claims in the First Amended Complaint." McCauley appeals from the Summary Judgment Order as it pertains to the malicious prosecution and IIED claims.[3]

¶10 We review a district court's grant or denial of summary judgment de novo. *Crane Creek Ranch v. Cresap*, 2004 MT 351, ¶ 8, 324 Mont. 366, 103 P.3d 535 (citation omitted). "Summary judgment is appropriate when 'there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Nat'l Indem. Co. v. State*, 2021 MT 300, ¶ 21, 406 Mont. 288, 499 P.3d 516 (citing M. R. Civ. P. 56(c)(3)). We therefore review only the "'pleadings, depositions, answers to interrogatories, admissions on file, and affidavits' to determine if there is a material issue of fact and whether the moving party is entitled to judgment as a matter of law." *Depositors Ins. Co. v. Sandidge*, 2022 MT 33, ¶ 5, 407 Mont. 385, ___ P.3d ___ (quoting *Andersen v. Schenk*, 2009 MT 399, ¶ 2, 353 Mont. 424, 220 P.3d 675). "We draw all reasonable inferences from the evidence offered in favor of the party opposing summary judgment; but 'conclusory statements, speculative assertions, and mere denials are insufficient to defeat a motion for

---

[3] McCauley does not address the District Court's tortious interference analysis and therefore we do not address it herein.

summary judgment.'" *B.Y.O.B., Inc. v. State*, 2021 MT 191, ¶ 12, 405 Mont. 88, 493 P.3d 318 (quoting *Sullivan v. Cherewick*, 2017 MT 38, ¶ 9, 386 Mont. 350, 391 P.3d 62).

¶11 McCauley argues the District Court erred in granting summary judgment on the malicious prosecution and IIED claims by applying the wrong standard. McCauley contends the District Court required him to produce facts clearly establishing his positions, rather than merely demonstrating the evidence on material facts was sufficiently disputed to create a jury issue that barred summary judgment.

¶12 The elements of a malicious prosecution claim are:

  (1) a judicial proceeding was commenced and prosecuted against the plaintiff;

  (2) the defendant was responsible for instigating, prosecuting, or continuing such proceeding;

  (3) there was lack of probable cause for the defendant's acts;

  (4) the defendant was actuated by malice;

  (5) the judicial proceeding terminated favorably for plaintiff; and

  (6) the plaintiff suffered damage.

*Plouffe v. Mont. Dep't of Pub. Health & Human Servs.*, 2002 MT 64, ¶ 16, 309 Mont. 184, 45 P.3d 10 (citations omitted). "If one of these elements is not proven by *prima facie* evidence, judgment as a matter of law may be entered for the defendant." *Plouffe*, ¶ 16 (citing *Orser v. State*, 178 Mont. 126, 135, 582 P.2d 1227, 1232 (1978)).

¶13 "A malicious prosecution begins in malice, without probable cause to believe the action can succeed, and finally ends in failure." *Plouffe*, ¶ 16 (citation omitted). The

8

District Court concluded that McCauley failed to establish *prima facie* evidence of both lack of probable cause and favorable termination of the underlying judicial proceeding. Because we conclude the District Court correctly determined that probable cause existed for the underlying action, we affirm on that basis alone.

¶14 In the context of malicious prosecution, "an individual has probable cause to bring civil litigation when they have a reasonable belief in the existence of facts upon which the claim is based, and reasonably believe that those facts give rise to a valid claim." *Spoja v. White*, 2014 MT 9, ¶ 12, 373 Mont. 269, 317 P.3d 153 (citing *Hughes v. Lynch*, 2007 MT 177, ¶ 16, 338 Mont. 214, 164 P.3d 913; *Plouffe*, ¶¶ 18-19). "Probable cause is determined under an objective standard on the basis of the facts known to the party initiating the legal action . . . the issue must be submitted to the jury for resolution when direct and circumstantial evidence related to the defendant's knowledge is susceptible to different conclusions by reasonable persons." *Plouffe*, ¶ 18 (citation omitted). Probable cause becomes a question of law, however, when based on the totality of the circumstances, "no evidentiary conflict exists and the uncontroverted evidence admits only one conclusion." *Plouffe*, ¶¶ 18-19 (citations omitted).

¶15 The District Court concluded that Crowley had probable cause to file the above-referenced claims based upon the information it possessed at the time of filing. The court reasoned it was undisputed that, by the time the claims were filed, Crowley had met with the Perkinses several times, learning about their interactions with McCauley; learned that the transaction with McCauley had triggered a mortgage foreclosure by the reverse

9

mortgage holder; reviewed the transaction documents and eviction filings possessed by the Perkinses; preliminarily investigated McCauley and his other dealings; conducted substantial legal research regarding possible claims arising from the transaction; and obtained the Perkinses' verification of the Counterclaim's contents. It is undisputed that Perkinses recounted to Crowley, to the best of their ability, the details of their transaction with McCauley, in addition to providing Crowley with the transaction documents, but that they were unable to articulate the precise terms of the transaction beyond their general understanding. As described above, the documents themselves demonstrate a complex transaction that, at the very least, was steeply tilted in McCauley's favor. Stripped to its essence, the transaction: 1) questionably valued Perkinses' interest in the property; 2) transferred title to McCauley for approximately $5,000 at closing; 3) required Perkinses to pay rent for the property, starting at $425 per month for three years and then increasing to $1,425 per month; 4) appointed McCauley attorney-in-fact to take actions related to the property in Perkinses' name; 5) concealed the transaction from Perkinses' mortgage holder in violation of that mortgage; 6) delayed payment of Perkinses' equity interest for ten years at a below-market interest rate, scheduling the payment when Perkinses were in their 90s. In contrast, under the reverse mortgage, Perkinses could have kept title to their property, stayed in the property without a mandatory payment obligation, and avoided payment until they sold or moved from the property. The $1,425 monthly payments, had Perkinses paid them, would have exceeded the $74,255 payoff of their interest by 2025. The transaction crashed when the efforts to conceal it from the reverse mortgage company failed.

10

¶16    We conclude the undisputed evidence demonstrates a reasonable belief, known by Crowley at the time of filing the clams, that the Perkinses' were induced into this transaction through fraud or misrepresentation, and that the content of the transaction constituted fraud, a breach of consumer protections, a violation of other duties, or was otherwise unlawful.  All of the counterclaims Crowley filed are related to the facts known to it and represent valid claims against McCauley.  Thus, as a matter of law, Crowley had probable cause to file the claims.  *See Spoja*, ¶¶ 12-13.

¶17    McCauley argues the District Court improperly weighed the Perkinses' deposition testimony in Crowley's favor, particularly regarding six representations McCauley made to the Perkinses in order to secure their signing of the transaction documents.  McCauley also points to excerpts from the Perkinses' depositions wherein they cannot specify the falsehoods McCauley allegedly made to them regarding the transaction, and where Samuel Perkins cannot recall seeing or signing the Counterclaim at the time he verified it.  McCauley contends that a jury could find from these excerpts that Crowley never reviewed the counterclaims with the Perkinses and had them "sign a verification of a set of misrepresentations [they] never knew about or believed in."  Thus, a jury could also find that Crowley lacked the necessary probable cause to allege the misrepresentations it attributed to McCauley in the Counterclaim.

¶18    The excerpt from Joyce Perkins' deposition is a single page and, as such, the context of the questioning from which it is excerpted is unknown.  Joyce apparently represented, however, that at the time of her deposition she could not recall anything McCauley said

11

during the transaction that was untrue. Likewise, McCauley points to an excerpt from Samuel Perkins' deposition in which he struggles to remember what the misrepresentations alleged in the Counterclaim were, and simply stated that, "there's a lot of misrepresentation, but I don't have those things on the tip of my tongue."

¶19 After reviewing the deposition transcripts, we disagree with McCauley's argument. In establishing whether probable cause existed, the issue is whether *at the time of filing the complaint* the *defendant* had a reasonable belief in facts that would cause a reasonable person to file suit. *Spoja*, ¶ 13. Even viewing this testimony in the light most favorable to McCauley, it merely establishes the Perkinses could not recall or explain at the time of their deposition the specific falsehoods alleged in the Counterclaim. That may have weakened their case, but it does not support a conclusion that they did not have one. And we must remember that the Perkinses are not the defendants in this action—the claim is made against Crowley, regarding what Crowley understood at the time it filed the Counterclaim. *Spoja*, ¶ 15. McCauley's position—that because the elderly Perkinses could not remember specific misrepresentations during a years-later deposition, Crowley did not have a reasonable basis to believe in the facts underlying the Counterclaim at the time it was filed—constitutes speculation, rather than direct evidence disputing what Crowley knew. While evidence is reviewed on summary judgment in the light most favorable to the non-moving party, summary judgment cannot be defeated by speculation alone. *B.Y.O.B., Inc.*, ¶ 12. Probable cause becomes a question of law when, based on the

12

totality of the circumstances, "no evidentiary conflict exists and the uncontroverted evidence admits only one conclusion." *Plouffe*, ¶¶ 18-19 (citations omitted).[4]

¶20 Finally, McCauley challenges the District Court's granting of summary judgment in Crowley's favor on his IIED claim. A stand-alone IIED claim can be maintained only upon a showing that the plaintiff "suffered 'serious' or 'severe' emotional distress as the reasonably foreseeable consequence of the defendant's act or omission." *Puryer v. HSBC Bank USA, Nat'l Ass'n*, 2018 MT 124, ¶ 38, 391 Mont. 361, 419 P.3d 105 (quoting *Sacco v. High Country Indep. Press*, 271 Mont. 209, 237, 896 P.2d 411, 428 (1995)). But a privileged action, such as exercising a legal right, cannot become the basis for an IIED claim. *Judd v. Burlington N. & Santa Fe Ry.*, 2008 MT 181, ¶ 31, 343 Mont. 416, 186 P.3d 214 (citation omitted). McCauley's arguments that he suffered serious or severe emotional distress stem from his allegations that Crowley lacked probable cause to file its counterclaims. Because we affirm the District Court's conclusion that McCauley has not established a claim for malicious prosecution, McCauley's IIED claim likewise fails because Crowley was pursuing its legal rights in a permissible way. *See Judd*, ¶¶ 30-31 (citations omitted).

---

[4] McCauley also argues that an excerpt of Samuel's deposition evidences that Crowley did not read or discuss the Counterclaim with him before having him sign it. Even if that assertion is true, it does not undermine what Crowley knew at the time the Counterclaim was filed. *Spoja*, ¶ 15. Rather than raise an issue as to probable cause, the potential questions raised by the testimony go to Crowley's duty to its client and standards of care, not to malicious prosecution, except, again, by speculation. *See Spoja*, ¶ 15.

13

¶21 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent. The District Court correctly granted summary judgment in Crowley's favor.

¶22 Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR